William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

---

WILLIAM G. PONDER, APPELLANT, *vs.* WM. D. MOSELEY, MARTHA ANN MANLY AND HIRAM MANLY *de jure uxoris*, ADMINISTRATORS *de bonis non* OF SAMUEL PARKHILL DECEASED, APPELLEES.

To authorize the assertion that a judgment is void it must have emanated from a Court of limited jurisdiction not acting within its legitimate prerogative or from a Court of general jurisdiction where the parties are not actually or by legal construction before the Court and subject to its jurisdiction.

Judgments of Courts of general jurisdiction are not considered under any circumstances as mere nullities, but as records importing absolute verity, and of binding efficacy until reversed by a competent appellate tribunal. They are voidable, not void.

The title of a purchaser at a sale under execution issued from a Court of general jurisdiction, is not affected by a subsequent reversal of the judgment on which the execution was based.

B. a creditor sued M. and M. administrators of the debtor. The defendants pleaded in bar. Afterwards the letters of M. and M. were revoked; and subsequently M. and M. and *another* were appointed administrators *de bonis non.* M. and M. pleaded their dismissal in bar *puis darrien continuance.* The plaintiff replied the re-appointment of M. and M. The defendants rejoined that although reappointed with *another* as administrators *de bonis non,* a judgment had been recovered against them in their *new* character sufficient to cover the assets in their hands. The plaintiff then demurred, and judgment was rendered in favor of the plaintiff against M. and M. as administrators. Execution was issued to be levied of the goods of P., the intestate, in the hands of M. and M. as administrators. Under this execution the officer levied on the property of P., the intestate, in the hands of the administrators *de bonis non,* and a sale was made. After the sale M. and M. sued out a writ of error from the Supreme Court, and the judgment was reversed. Held that the purchaser at this sale acquired a good title.

The doctrine of estoppel in *pais* laid down in Cotten *vs.* Williams, and Camp *vs.* Parkhill's administrators decided at this term, approved.

Appeal from Leon Circuit Court.

The appellees as administrators *de bonis non*, instituted an action of detinue against the appellant in Leon Circuit Court to recover sundry slaves in the possession of defendant below, alleged to be the property of Samuel Parkhill, deceased.

The declaration contains two counts in usual form—one alleging a delivery by plaintiffs and a detention after demand—the other a finding by defendant and a like detention.

The defendant pleaded three pleas:

1. *Non detinet.*

2. That the slaves were not the property of plaintiffs.

3. That plaintiffs were not lawfully possessed of the negro slaves.

Upon these the plaintiffs joined issue.

The plaintiffs to maintain the issues joined on their part, offered the following evidence and testimony.

*First,* It was admitted by defendant's counsel that the plaintiffs were administrators and administratrix of the estate of Samuel Parkhill left unadministered, as set forth and stated in the declaration filed herein.

The said plaintiffs then introduced Thomas Brown, who being duly sworn as a witness, deposed as follows: Being shewn three paper writings, says they are appraisements of the slaves of plaintiffs intestate.

Witness was one of the appraisers to appraise the slaves of Intestate's Estate; saw the slaves in these papers enumerated, exhibited as the property of said Estate, on the plantation of the plaintiffs' intestate. They were then in possession of one of the plaintiffs as administratrix of Intestate. Does not know what became of these slaves, except from having occasionally seen some of them since. There was one slave named *Juba* there exhibited, appraised at three hundred and fifty dollars; another *Caroline*, at five hundred and fifty dollars; another *Jane*, at two hundred and fifty dollars; another *Frank*, at two hundred and fifty dollars; another *Margaret*, at two hundred dollars—this last slave was named in another and late inventory; another slave *Albert*, appraised at one hundred and fifty dollars; another, *Anderson*, at one hundred dollars; another *Pleasant*, at fifty dollars. Thinks slaves have advanced in value since that time twenty-five per centum. Does not know that he has ever seen the above named slaves since. Knows nothing personally of any sale of these slaves.

*Cross examined.*—Says he does not know that the slaves above named are the same that are now claimed from defendant.

The said plaintiffs then offered in evidence the record, and pleading and entry of the judgment in favor of the Union Bank of Florida, against Manly and wife; administrators of Parkhill, the execution issued thereon, the levy and return, or report of the sale of the slaves levied on by John G. Camp, Marshal of Middle District of Florida, to wit :

At a Superior Court for the county of Leon, continued and held at the Court House, in the city of Tallahassee, on Saturday, the 1st day of March, A. D. 1845,

Present, the Honorable SAMUEL J. DOUGLAS, Judge.

Union Bank of Florida, *Plaintiff,* ⎫
vs. ⎪
Martha Ann Manly, late Parkhill, and Hiram Manly, ⎬ In debt.
in right of his wife Martha Ann, adm'rs of Samuel ⎪
Parkhill, ded'd, *Defendants.* ⎭

This day came the parties by their attorneys, and the plaintiff by his attorney, filed his special demurrer to the defendant's rejoinder to the plaintiff's replication filed herein to the defendant's amended plea *puis darrien continuance* filed by leave of the Court on the 24th February last, in which demurrer the defendants joined.— Whereupon the matters of law arising upon the plaintiff's demurrer to the said rejoinder being argued, it seems to the Court here, that the said rejoinder, and the matters and things therein alleged, are not sufficient in law to bar or preclude the plaintiff from having and maintaining its action aforesaid against the said defendants, therefore it is considered by the Court that the said plaintiff recover against the said defendant the sum of $94,182 22-100 parcel of the debt in the declaration mentioned, and the sum of $27,982 65-100 its damages, making together the sum of one hundred and twenty-two thousand one hundred and sixty-four dollars and eighty-seven cents, and its costs by it about its suit in this behalf expended, to be levied of the goods and chattels, slaves, lands and tenements of the said intestate, Samuel Parkhill, dec'd, in the hands of the defendants to be administered, and the said defendants in mercy, &c.

THE TERRITORY OF FLORIDA,

*To all and singular the Marshals of said Territory*—GREETING :

We command you, that of the goods and chattels, slaves, lands tenements of Samuel Parkhill, deceased, in the hands of Martha

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

Ann Manly, late Parkhill, and Hiram Manly, in right of his wife said Martha Ann, administrator of Samuel Parkhill, dec'd, remaining to be administered, you cause to be made the sum of ninety-four thousand one hundred and eighty-two dollars and twenty two cents, its debt, and also twenty-seven thousand nine hundred and eighty-two dollars and sixty-five cents, its interest and damages, making together the sum of one hundred and twenty-two thousand one hundred and sixty-four dollars and eighty-seven cents, which the Union Bank of Florida lately, on the first day of March, 1845, recovered in our Superior Court of the county of Leon, in the Middle District, as well for its debt as its damages occasioned by the detention of said debt, and likewise the sum of seven dollars and eighty-two cents, which to the said Union Bank of Florida in the same Court adjudged for its costs by it in that behalf expended, together with lawful interest on said damages from the rendition of said judgment till paid, and the costs of this writ and of your proceedings hereon, and that you have the said sums of money before the Judge of our said Court, at Tallahassee, when satisfied, to render the said Union Bank of Florida the sums aforesaid, and have then and there this writ. Witness Richard T. Birchett, Clerk of our said Court, at Tallahassee aforesaid, this 20th day of March, A. D., 1845, and of the Independence of the United States the sixty-ninth year.

[SEAL.]                        R. T. BIRCHETT, Clerk.

This execution was levied on certain slaves of the estate, and at the sale the defendant purchased the slaves mentioned in the declaration.

Defendant by his counsel objected to the introduction thereof as evidence before the Jury, but the Court overruled the objection, and thereupon the same were read to the Jury and the defendant by his counsel excepted.

The said Plaintiff then offered in evidence two paper writings purporting to be bills of sale by John G. Camp, M., to defendant of certain slaves named in the declaration, which said writings had been obtained from defendant by notice and rule as prescribed by statute.

Know all men by these presents, that whereas, by virtue of several executions issued out of the Clerk's office of the Superior Court of the Middle District of Florida, for Leon County, wherein the Union Bank of Florida and others are plaintiffs, and the administrators of Samuel Parkhill, deceased, are defendants, I did, as Mar-

shal of said District levy upon the hereinafter described negro slave Caroline, as the property of the said Samuel Parkhill, deceased, to satisfy said writ; and whereas, the said negro slave was by me this day exposed for sale at public auction, according to the statutes in such case made and provided, and sold to William G. Ponder for five hundred and thirty-five dollars, being the highest sum bid for the same; Now know ye, That I, John G. Camp, Marshal of said District, by virtue of the said writs of execution, and by force of the statutes in such case made and provided, in consideration of the said sum of five hundred and thirty-five dollars, to me in hand paid by William G. Ponder, the receipt whereof is hereby acknowledged, have granted, bargained, sold and transferred, and by these presents do grant, bargain, sell and transfer to the said William G. Ponder, his heirs, executors, administrators, and assigns forever, the negro slave named Caroline, and all the right and interest which the said Samuel Parkhill, deceased, had in or to the said named negro, to have and to hold the said negro unto the said William G. Ponder, his heirs, executors, administrators, and assigns, as fully as I, the said John G. Camp, as Marshal as aforesaid, under the authority aforesaid might or ought to convey and sell the same. In witness whereof, I have hereunto set my hand and affixed my seal this fifth day of May, Anno Domini, 1845, and of the Independence of the United States the sixty-ninth year.

JOHN G. CAMP, [L. S.]<br>Marshal.

Know all men by these presents, That whereas by virtue of sundry executions issued out of the Clerk's office of the Superior Court of the Middle District of Florida for Leon County, wherein the Union Bank of Florida and others are plaintiffs, and the administrators of Samuel Parkhill, deceased, are defendants, I did, as Marshal of said District, levy upon the hereinafter described negro slaves, to wit : Juba, Jane, Frank, Margaret, Albert, Anderson, Pleasant, as the property of the said Samuel Parkhill, deceased, to satisfy said writ; and whereas, the said negro slaves were by me this day exposed for sale at public auction, according to the statutes in such case made and provided, and sold to William G. Ponder for fifteen hundred dollars, being the highest sum bid for the same: Now know ye, That I, John G. Camp, Marshal of said District, by virtue of the said writs of execution, and by force of the statutes in such case made and provided, in consideration of the said sum of fifteen

hundred dollars to me in hand paid by William G. Ponder, the receipt whereof is hereby acknowledged have granted, bargained, sold and transferred, and by these presents do grant, bargain, sell and transfer to the said William G. Ponder his heir, executors, administrators and assigns forever, said negroes named as above, and all the rights and interest which the said Samuel Parkhill, deceased, had in or to the said named negroes, to have and to hold the said negroes unto the said William G. Ponder, his heirs, executors, administrators and assigns as fully as I, the said John G. Camp, as Marshal as aforesaid under the authority aforesaid, might or ought to convey and sell the same. In witness whereof, I have hereunto set my hand and affixed my seal this sixth day of May, Anno Domini, 1845, and of the Independence of the United States the sixty-ninth year.

JOHN G. CAMP, [L. S.]

Marshal.

The said Plaintiffs then offered to read in evidence the entry of the Judgment of the Superior Court of the Middle District of Florida upon an appeal from an order of the County Court of Leon County, removing Mrs. Martha A. Manly from the office of administratrix of Samuel Parkhill, deceased, to wit:

At a Superior Court for Leon County continued and held at the Court House in the City of Tallahassee, on Monday the 18th day of March, A. D., 1844: Present the Honorable Samuel J. Douglass, Judge.

In the matter of the Estate of ⎫    On an appeal from an order of
  Samuel Parkhill, dec'd.      ⎬   the County Court of Leon County revoking the administration of Martha Ann Manly late Martha Ann Parkhill.

This cause coming on to be heard anew upon the merits, and it appearing to the satisfaction of the Court, that Henry Bond, Richard K. Call, George K. Walker and Benjamin W. Gause, the securities upon the official bond of said Martha, are insufficient: It is therefore ordered that the judgment and decree of the County Court be affirmed and that the letters of administration heretofore granted to the said Martha be and remain revoked, annulled and set aside. It is further ordered that John G. Camp, Esq., Marshal of the District of Middle Florida, do take the property of the said estate of Samuel Parkhill in his possession to remain there till the further order and direction of this Court.

To the introduction of which defendant by his counsel objected, but the Court overruled the objection, and allowed the evidence to go to the Jury, and defendant by his counsel excepted.

The said plaintiff then proved that the term, "sundry executions issued out of the Clerk's office," as stated in the bills of sale referred to and given in evidence were the following :

Execution No. 3278 in favor of C. B. Bioron.
"        "    3279    "       George B. Pease.
"        "    3280    "       Ann Davidson.
"        "    3281    "       R. T. Birchett, assignee.
"        "    3282    "       Same.
"        "    3283    "       Richard A. Saunders.
"        "    3284    "       P. Philips.
"        "    3285    "       Moore and Monford.
"        "    3286    "       William Fisher.

All against Hiram Manly and Martha Ann Manly, administrators of Samuel Parkhill, deceased.

It was admitted by defendant's counsel that these were executions issued on the same day, and on judgments rendered at the same term, and on the same pleadings as the case of the Union Bank against Manly and wife, administrators of S. Parkhill.

The said plaintiff also introduced and read to the Jury the mandate of the Supreme Court, reversing the judgment rendered in the Superior Court at the suit of the Union Bank of Florida against Martha Ann Manly and Hiram Manly, administrators of the estate of Samuel Parkhill, deceased, and the entry of this Court thereon dismissing said suit.

The said plaintiffs then offered to introduce in evidence the original deeds of Mortgage executed by Samuel Parkhill in his life time to the Union Bank of Florida, (nine in number,) to secure his shares of stock in said Bank, with the view of proving that the slaves in suit were embraced in said mortgages, &c., &c., to the introduction of which evidence the defendant by his counsel objected, but the Court over-ruled the objection and the defendant excepted to the decision, and thereupon, an abstract of the said mortgages which it was agreed should stand in lieu of said original deeds, was given in evidence to the jury, to wit :

STOCK MORTGAGES.

Memorandum of Samuel Parkhill to the Union Bank of Florida : 19 March, 1835—N. E. 1-4 Sec. 3, T. 1.

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

E. 1-2 N. W. 1-4 Sec. 3, T. 1.

W. 1-2 N. W. 1-4 Sec. 2, T. 1.

S. E. 1-4 Sec. 34, T. 2, R. 2, N. & E.

E. 1-2 S. W. 1-4 Sec. 34, T. 2, R. 2, N. & E.

W. 1-2 N. E 1-4 Sec. 34, T. 2, R. 2, N. & E.

S. W. 1-4 Sec. 35, T. 2, R. 2, N. & E.

For fifty shares.        50.

1 February, 1837—N. W. 1-4 Sec. 31, T. 1, R. 4, N & E.

E. 1-2 S. E. 1-4 "        "        "        "

E. 1-2 S. E. 1-4 Sec. 36, T. 1, R. 3, N. & E.

W. 1-2 S. W. 1-4 Sec. 31, T. 1, R. 4, N & E.

W. 1-2 S. E. 1-4 Sec. 36, T. 1, R. 3, N. & E.

Slaves—Homidy, Doll, Elias, Sarah, Hagar, Elizabeth, Sam, Johnny, Juba, Jane.

For sixty shares.        60

(Note—The Land with 31 shares transferred to H. J. Mills.)

7 March, 1838—Remortgage of the property in the two preceding mortgages for forty-one shares.                        41.

(Note—13 shares transferred to H. J. Mills.)

16 May, 1838—N. E. 1-4 Sec. 33, T. 2, R. 2, N. & E.

E. 1-2 N. W. 1-4 Sec. 33, T. 2, R. 2, N. & E.

N. W. 1-4 Sec. 34,        "        "        "

S. E. 1-4    "    33,        "        "        "

South 1-2    "    34,        "        "        "

S. W. 1-4    "    35,        "        "        "

W. 1-2 N. W. 1-4 Sec. 2, T 1,    "        "

N. E. 1-4        "    3, "        "        "

E. 1-2 N. W. 1-4    "    "    "        "        " *

Slaves—Cæsar, York, John, Toney, Bristo, Frederick, Elias, Claibourne, Dick, Bob, Johnny, William, Old Tom, Ned, Albert, Davy, Frank, John, Sy, Lisbon, Ben, George, William, Primus, Elleck, George, Jim, Toney, Horris, Toney, Cuff, York, Dick, Cuba, Amy, Grace, Abram, Rose, Malinda, Francis Beck, Juba, Fillis, Cloe, Amy, Francis, Susannah, Little Juba, Jane, Margaret, Frank, Mahala, Julia, Louisa, Rachel, Ellen, Matilda, Caroline, Celia, Maria, Nancy, Winney, Monica, Eddy, Kitty, Fillis, Hester, Amy, Israel, Sibby, Scipio and Long Mary.

For four hundred and seventy shares.        470.

(Note—105 shares transferred to the President of the Union Bank of Florida.)

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

16 May, 1838—W. 1-2 S. W. 1-4 Sec. 1, T. 2, R. 1, N. & W.

| | | | | |
|---|---|---|---|---|
| South 1-2 | " 2, | " | " | " |
| S. E. 1-4 | " 3, | " | " | " |
| W. 1-2 N. W. 1-4 | " | " | " | " |
| Lot 1 | " 4, | " | " | " |
| Lot 1 and 5, | " 9, | " | " | " |
| North 1-2 | " 10, | " | " | " |
| S. E. 1-4 sec. 10, | " | " | " | |
| E 1-2 S. W. 1-4 " | " | " | " | |
| Fractl. sec. 11, | " | " | " | |
| " sec. 14, | " | " | " | |
| " sec. 15, | " | " | " | |
| Lot 1, sec. 21, | " | " | " | |
| Lots 1 & 2, sec. 22, | " | " | " | |

Slaves—John, William, Edmund, Wilson, Little Wilson, Pitman, Sam, Henry, Rochester, Israel, Daniel, Richard, Tom, Eliza, Polly, Nañcy, Matilda, Barbara, Spottswood, Peggy, Mary, Daniel, Penny, Rachel, Emily, George, Phil, Billy, Frederick, Homady, Ned, Jack, Morgan, Anthony, Gully Jack, Tom Harkney, Tom Gonder, Sam, Homady, Primus, Isaac, John, Dolly, Sarah, Hagar, Elizabeth, Fanny, Morgianna, Martha Ann, Mary, Molly, Margaret, Diana, Ellen, Elizabeth, Sam, Sarah, for six hundred and ninety shares. 690.

(Note, 93 shares transferred to the President of the Union Bank of Florida.)

20 May, 1838—S. W. 1-4 sec. 3, T. 2, R. 1, N. & W.

| | | | |
|---|---|---|---|
| E. 1-2 n. w. 1-4 " | " | " | " |
| W 1-2 n. e. 1-4 " | " | " | " |
| Lot 6, sec. 4. | " | " | " |
| Lots 2, 3, 6 & 7, sec. 9, | " | " | " |
| Lot 8, sec. 4, | " | " | " |

For one hundred and one shares. 101:

15 May, 1839—Gabriel, William, Squire, George, Isaac, Jacob, Kealing, Jacob, Moses, York, Albert, Adeline, and child, Martha, Ann and two children, Mary and child, Clarissa, Sarah and child, Billy, Mariah and child, Francis Goodwin, Ann and child, Queen and child, Hannah and child, Eliza, Emily, Rachel, Margaret, Fenton, Roday, Jane, Kitty, Judy, Patty, Jacob, Jim, Peter, Gabriel, Dick, Daniel, Hackless, Harriet, Walker, Willy, George, Nancy

William G. Ponder, vs. W. D. Moseley and others, Administrators.

B. and child, Maria and child. Patsey, Cely, Nancy Burwell, for
two hundred shares,     200

25 January, 1840—Slaves—Sy, Kitty.

                     For five shares,     5

29 Feb. 1840—W. 1-2 s. e. 1-4 sec. 29, T. 2, R. 3, n. & e.
             S. E. 1-2 s. e. 1-4 sec. 30, "    "    "
             S. E. 1-4 n. e. 1-4    "    "    "    "

                     For eight shares,     8

| | | | |
|---|---|---|---|
| 19 March, 1835, | | 50 | shares. |
| 1 February, 1837 for | 60 shares. | | |
|     Transfer to Mills, | 31 | | |
| | — | 29 | " |
| 7 March, 1838, for | 41 | | |
|     Transfer to Mills, | 13 | | |
| | — | 28 | " |
| 16 May, 1838, for | 470 | | |
|     Transfer to Prest't U. B., | 105 | | |
| | — | 365 | " |
| 16 May, 1838, | 690 | | |
|     Transfer to Pres't U. B., | 93 | | |
| | — | 597 | " |
| 20 May, 1838, | | 101 | " |
| 15 May, 1839, | | 200 | " |
| 25 January, 1840, | | 5 | " |
| 29 February, 1840, | | 8 | " |
| | | 1383 | shares. |

Union Bank of Florida, 15 July, 1847.

                   C. G. ENGLISH,
                      *Sol. U. B.*

And the said plaintiffs here rested their cause.

The defendant by his counsel then submitted his defence to the
jury, and offered. as an admission agreed upon by the counsel on
both sides the following statements :

" It was agreed and considered as admitted that one of the slaves
purchased by Ponder applied to the plaintiff Moseley before the
sale to purchase her, because she had a husband owned by Ponder,
who resided in the neighborhood ; Moseley said he was unable to
purchase, and recommended the slave to apply to Ponder to pur-

chase her. Accordingly the slave went over to Ponder's place, and afterwards Ponder came to the Court House, and after the conversation alluded to by Ponder in his testimony in Camp's case, the negro was bid off by Ponder."

The following testimony of Ponder in Camp's case to be considered as part of the admission, to wit:

"William G. Ponder stated he was present at the sale of the Parkhill slaves under executions of Union Bank and others, in the Spring of 1845. He further stated that Moseley was present at the sale, and advised him (the witness) to purchase. Some suggestions being made as to the title, Moseley said there would be no difficulty—said he had hired the negro, and that it would suit the witness—said he thought there would be no difficulty about the property. Being cross-examined, and in answer to a question from plaintiff's counsel, said the general impression was, that all the difficulty about the property had been done away—it was supposed that the judgment was legal, and had a right to sell the property."

Also called William Bloxham, who, being duly sworn, said he was present at the sale of Parkhill's slaves made by Marshal Camp. Messrs. Manly and Moseley were present. Col. Gamble, President of the Union Bank, was bidding for slaves for Meinetzhagen, and was buying without competition, when Manly asked witness to bid against him. Witness did so, and caused the slaves bought by Col. Gamble to bring about fifteen hundred dollars more than they would have done. Moseley was present directing the sale, and arranging them in lots to be sold: for one slave, Ellen, he bid, and run her up to a large price, stating that she was to be replevied, and to be bought for Mrs. Brockenbrough. To the sale of this slave he objected, but to the sale of none others; he had a book with a list of the slaves in his hand, and stated he was desirous to keep the slaves in the little mortgage from being then sold. Was present at a conversation between Plaintiff, Moseley, and Archer, when the latter observed that he intended to stop the negroes bought at the sale, and which the purchasers intended to send for sale to New Orleans. Witness then took Plaintiff Moseley aside and stated to him that a friend of witness had bought some negroes at the sale and intended to send them for sale to New Orleans, and witness wished to know the intention of Moseley so as to advise his friend. Moseley then said that he would not lend his name to any interference with the sale, that he had felt greatly relieved thereby. When witness

28

came up to the sale, Mr. Thompson was concluding an address to the people saying that the sale was good and valid.

*Cross examined,* said he did not hear the sale forbid by Archer.—— The place of conversation above alluded to, was in Fisher's tavern. The remarks of Moseley above narrated, occurred only between witness and Moseley, and apart from Archer; at that time the slaves alluded to were near town on their way to be embarked; with respect to Manly's suggestion to witness to bid, witness had on his own mere motion bid before, but in bidding against Gamble, witness bid beyond the value under an assurance that Gamble would bid more, and with a view to increase the credit of Parkhill's estate. Ponder was not present at the conversation between Moseley and witness. Does not know whether Ponder was present when Manly urged witness to bid. Witness bid off two negroes at the request of a friend, so stating at the time to the Marshal. Knows Juba and Caroline, two of the slaves named in Ponder's bill of sale, but not their present value. Cannot state the value of the hire of the slaves. Juba, for an old woman, was a good hand, and was worth from forty to seventy dollars per year; Caroline about eighty dollars, the price fluctuating and generally low. A female slave of thirteen years would hire for about thirty dollars; a girl of eleven and a boy of ten would be worth about their victuals and clothes. The witness bid for several slaves and all for Dorsey. Thinks the slaves altogether, and those bought by defendant, sold high, and for as much as they would have brought since. Witness has been sued for the negroes bought for Dorsey.

Also called *John G. Gamble,* who being duly sworn deposed—was present at the sale of the slaves by the Marshal in 1845, and took part in it. Moseley, the plaintiff in this suit, stood beside the witness, and took an active part in the sale. Moseley kept memoranda of the sales, divided the slaves into families and lots to have them sold. Moseley professed his entire satisfaction at the sale, stating that he was pleased to have the business closed. Ponder was present and bought at the sale. Moseley urged the bidding. The Marshal counselled during the course of the sale with Moseley, and sold under his instructions. By Moseley's directions the slaves were so divided as to bring the largest price. Thinks Moseley bid for Ellen, and run her up to eight hundred dollars or more, avowing that he bid for Mr. Brockenbrough. Moseley expressed to witness his satisfaction that the sale was made, as he wished to get rid of the concern.

*Cross examined,* says he did not hear the sale forbid by Mr. Archer. Has heard Ponder say he bought slaves at the advice of Moseley. In the year 1834 the witness borrowed money from Ponder to enable him to go to Europe to negotiate the bonds of the Territory of Florida. This was before the Bank went into operation. Did not then or since explain the nature of the charter of the Union Bank to the defendant.

Also, called *John G. Anderson,* who being duly sworn said, was present at the sale spoken of on the first day, saw the plaintiffs Moseley and Manly present at the sale. Manly kept a list; Moseley also kept a list, and directed the sale. Witness, acting for another person, applied to have a family put up in one lot; the Marshal declined without Moseley's concurrence; Moseley refused, and required the slaves to be put up separately, that they might bring more money, and they were thus sold. Heard Moseley bid more than once at the sale, and take the general direction of the sale.— Heard all that Archer said. He got on a bale of Cotton, and stated that the widow's dower had not been allowed, and for that reason, he forbid the sale.

Also called *David D. Young,* who being duly sworn, said, was present at the sale alluded to, heard, on the occasion of one of the slaves being offered, and not being run up, the plaintiff Moseley say, " bid up, bid up gentlemen, the property is not bringing half its price. The title will be good." After that the property sold better. This declaration was made to the crowd around. Many persons were present.

*Cross examined,* said, the declaration was made in a loud tone to those around, and might be heard at the distance of ten paces.— Heard Mr. Archer say, that so far as he represented the widow, he forbid the sale.

Also called *Edward Houston,* who being duly sworn said, he was present at the sale, and saw there the plaintiffs Moseley and Manly. Moseley assisted at the sale in pointing out and stating the qualities of the slaves. Manly had a list also. Did not hear Moseley bid, or advise others to bid. Heard Mr. Archer state that he claimed a title for Mrs. Manly's dower. Heard Mr. Thompson in reply say that the right of dower had been adjudicated and decided against, and that the title was good.

Also called *Medicus A. Long,* who being duly sworn said, was present several times at the sale for short periods, and at the begin-

ning Mr. Archer got up and forbade the sale in the right of the widow and in her behalf; that she claimed dower, and they must purchase subject to her title. He spoke in a loud tone to the crowd.—Moseley was present with a list of the slaves, directing the sale, calling up and naming the slaves, and the order and manner of the sale. Heard the instance stated by Mr. Anderson.

Also called *Otis Fairbanks,* who being duly sworn, said he was present at the sale. A few minutes before the sale, Governor Moseley stood on the steps. As the first slave was put on the stand, Mr. Archer rose and forbid the sale on account and behalf of the widow. Mr. Thompson replied, and asserted the sale was valid. On Archer's forbidding the sale, Gov. Moseley by his manner and exclamation, expressed disapprobation, saying the sale had better go on, they could not be sold at a better time. After that heard Moseley say, " bid, bid, I do not wish the negroes to go for nothing." This remark seemed to be induced by the fact that just then some slaves had sold low ; after it was made they sold better. Only saw Manly present and keeping a list of the sales.

Also called *Leslie A. Thompson,* who being duly sworn, said, that he was present at the sale. Before any slave was sold, Mr. Archer rose and said that on the part of the widow he gave notice that the widow had not had her dower assigned, and that all who purchased would do so at their peril subject to the widow's dower. Witness rose to reply, and stated that a claim similar to Mrs. Manly's had been decided against, and that the title was good against her claim. Did not see Gov. Moseley until the bidding commenced. Saw Moseley bid for two slaves at least ; heard him say to one of the crowd, when a negro was bid off, you have made a bargain ; to another he spoke and encouraged him to bid ; heard him object to a family being sold entire, and at his suggestion they were sold singly.

*Cross examined.*—Saw Governor Moseley on the ground before the first slave was bid off. Did not hear Mr. Archer say one word about any other claim than the widow's dower,—nothing about the claim of the administrators *de bonis non.* Witness in his reply did not state anything about the Union Bank of Florida, its mortgages or interest. Did not see Manly do, or hear him say anything. Did not then notice Mr. Ponder. Witness did not before or since this suit hear him say anything about the Union Bank of Florida mortgages, &c., &c. Went to the sale on the part of the Attorney of

the Bank, and with no purpose of making any statement until he heard Mr. Archer's statement.

Defendant having here rested his cause, the plaintiffs offered to read in evidence a bill filed on the Equity side of the Superior Court of the Middle District of Florida, in which William D. Moseley and his sureties were complainants praying relief, &c., to wit:

To the Honorable Samuel J. Douglas, Judge of the Superior Court of the Middle District of Florida, in and for the county of Leon, in Chancery sitting: The bill of complaint of William D. Moseley, William Doggett, Green Chaires, Henry Doggett, Alexander Moseley, and William P. Moseley, respectfully represents, That complainant William D. Moseley, on or about the 23d April, 1844, was duly qualified administrator *de bonis non* jointly with Martha Ann Manly of the Estate of Samuel Parkhill, deceased, left unadministered by the said Martha Ann Manly, late Martha Ann Parkhill, the former administratrix. That said Co-Complainants were and are the sureties on the bond of said administrators *de bonis non*, but were never the securities of said Martha Ann in the original administration, that a large number of slaves all of about the value of seventy-five thousand dollars, left unadministered by said Martha, came to the possession of said William D. Moseley, administrator *de bonis non* as aforesaid, as will appear by reference to the inventory and appraisements thereof returned by said William D. Moseley to the County Court of Leon county, and signed by him and him alone, a certified copy of which will be produced, if necessary, at the trial of this cause. That on the 4th January, 1845, a judgment was rendered in Leon Superior Court against said administrators *de bonis non*, at the suit of the Union Bank of Florida, for upwards of seventy thousand dollars, to be levied of the goods and chattels, slaves, lands and tenements of said Samuel, deceased, in the hands of said administrators *de bonis non*, that said judgment remains of force against said Moseley, as administrator *de bonis non*, not satisfied or reversed as will appear by reference to the record of the proceedings therein in said court, under the statute of the Territory authorising the foreclosing of mortgages at common law.— That the judgment aforesaid is the only judgment recovered against said administrators *de bonis non*, and that said William D. Moseley since the rendition of the same, has retained until a few days past, the property of said estate in said inventory mentioned, to satisfy said judgment in case the same be affirmed in the appeal now pend-

ing in the Court of Appeals. That said complainant Moseley has hired out the slaves of said estate for the present year to divers persons for a large sum of money, to wit : Seven thousand dollars, and upon notes secured to be paid at the end of the year. That since the rendition of said judgment and since the hiring aforesaid, the said Union Bank of Florida; John C. Montford and Kidder M. Moore, Executors of William Turner, deceased, William Fisher, Pierpont Philips, Richard T. Birchett, assignee, Ann Davidson, Richard C. Saunders, George B. Pease, Charles B. Bioren, Lot Porter, Thomas R. McClintock, have severally obtained judgments, as complainants are informed, in Leon Superior Court, on the law side thereof, for various and large sums of money against the said Martha Ann Manly and Hiram Manly, her husband, as administrators of Samuel Parkhill, deceased, by virtue of the original administration by said Martha ; that said judgment creditors have sued out executions against said Manly and wife, as administrators, " *to be* levied of the goods and chattels, slaves, lands and tenements of the said Samuel Parkhill, deceased, in their hands as administrators, to be administered. That these complainants are not parties to said judgments, or sureties for said Martha, on her original administration, and are advised that they are in no wise liable for, or bound to pay said judgments or executions, and that they are in no wise responsible for any mal-administration, defaults, failures or devastavits of said Hiram and Martha, or either of them, in the management and administration of the estate of said Samuel, under the original administration. Nevertheless, these complainants expressly aver and now shew unto your Honor that the judgment creditors of Manly and wife above named, and John G. Camp, Marshal of the said Middle District, have proceeded under said executions to levy the same upon the estate of said Samuel in the hands of complainant William D. Moseley, as administrator *de bonis non*, retained to satisfy the judgment against him, and did in fact on Monday the 31st March, 1845, levy the same upon divers of said slaves then in the actual possession of the hirers of said slaves, and that they have advertised the said slaves to be sold on the first Monday in May next, to satisfy said judgments and executions against Manly and wife ; and these complainants further represent that said William D. Moseley and said other administrators *de bonis non*, have not since the administration by said Moseley committed any waste or devastavit of the effects of said estate, but that said William D. Moseley being in possession of said

estate, was proceeding to administer the same according to law, and to pay the judgment of the 4th January, 1845, recovered against him, if the same should be affirmed.

That unless the judgment creditors of Manly and wife, and the Marshal John G. Camp, Esq., are enjoined and restrained from proceedings so oppressive to said William D. Moseley and his said securities, and unless the said estate is protected in the hands of said William D. Moseley, administrator *de bonis non*, on the faith of which the judgment of the 4th January, 1845, was rendered, these complainants will be compelled in effect to pay the debts of Manly and wife, for which they are in no wise bound ; will be left without any assets to pay the judgment of 4th January, 1845, and will be compelled without waste or devastavit, default, or mal-administration on the part of the administrators *de bonis non*, for whom alone they are sureties, to pay out of their individual means the said judgment of the 4th January, 1845, in case the same is affirmed. All of which actings, doings and pretences, on the part of said judgment creditors, and said John G. Camp, are contrary to equity and good conscience, and tend to the manifest wrong, injury, and oppression of these complainants. In tender consideration whereof, and inasmuch as complainants are remediless in the premises, except in equity, where matters of this nature are properly cognizable and relievable. To the end, therefore, that the said Union Bank of Florida, Kidder M. Moore and John C. Montford, William Fisher, Pierpont Philips, Richard T. Birchett, Ann Davidson, Richard A. Saunders, Geo. B. Pease, Charles B. Bioren, Lot Porter, and Thomas R. McClintock, may, severally and respectively, under oath, full, true, direct, and perfect answer make, to all and singular the matters above set forth, and that as fully and particularly as if the same were here repeated, and they and every of them distinctly interrogated thereto; and that the said defendants above named and each of them, their and each of their agents and deputies, be perpetually enjoined, inhibited, and restrained from levying upon, selling, retaining, taking away, or otherwise interfering with said slaves or either of them, levied upon and advertised for sale, under and by virtue of said executions against said Manly and wife, as administrator and administratrix of the estate of Samuel Parkhill, under the original administration. That said defendants above named, and said John G. Camp, be decreed to re-deliver said slaves levied upon and advertised for sale to the several persons from whose ac-

tual possession they were taken, or to said William D. Moseley, or that such other and further relief be had in the premises, as to this Honorable Court shall seem meet and proper in the premises. May it please your honor, &c.

> ARCHER,
> *Sol. for Complainants.*

William D. Moseley being sworn, saith, that the matters of fact contained in the foregoing bill, as far as they are stated from his own knowledge, are true, and as to those matters stated upon information derived from others, he believes to be true.

> W. D. MOSELEY.

Sworn to and subscribed before me, this 4th April, A. D., 1845.

> SAM'L J. DOUGLAS, *Judge.*

Let the bill be filed—the injunction.is denied.

> S. J. DOUGLAS, *Judge.*

To the admission of which in evidence the said defendant by his counsel objected, but the Court overruled the objection, and allowed the said bill to be read in evidence to the jury, to which decision of the Court the defendant by his counsel excepted.

Also called *Francis H. Flagg,* who being duly sworn, said he was present at the beginning of the sale alluded to ; heard Mr. Archer's protest.    Mr. Archer protested against it as being irregular or illegal, and besides that, the widow had not her dower.

*Cross examined,* said, does not recollect that he said that while it was irregular or illegal, he used the terms, " besides that" the widow's dower had not been assigned.    He did not express any other particular cause of irregularity.    Mr. Thompson in reply said, · that the question of, or the right of dower in the widow had been decided, and the title was good.    Did not go there for the purpose of bidding.

Also called *Justus R. Fortune,* who being duly sworn, said, he was present at the sale ; heard either Judge Manly or Mr. Archer make an objection to the sale—he does not know which.— Cannot say whether he went there to bid or not; he did in fact bid off one old negro man, but did not take possession of him ; gave him up to Gov. Call.

Also called *John Daffin,* who being duly sworn, said he was present at the sale, and heard Mr. Archer get up and object to the sale and he thinks, but cannot certainly say, that the sale was illegal, as the widow had not her dower assigned her.    *Cross exam-*

*ined,* thinks he heard the word illegal, and that the widow had not her dower.

Also called *James T. Archer,* who being duly sworn, said, witness by a bill had made an application to the Court on the morning of the sale for dower for the widow. Did not press it, as the same point had been decided adversely, but wished it filed as notice.— Witness wrote a notice for Manley to make, but Manly hesitated, and then witness rose, (not on a cotton bale,) and in an excited and audible voice declared that the sale was illegal, and that the widow had a claim for dower, and all persons would purchase at their peril. Witness was much excited, and does not profess to state precisely what he did say. Mr. Thompson rose then, and equally excited, declared the sale legal, &c. Witness then went on to explain his understanding as to the effect and illegality of the judgments at and ever since the time they were rendered, and he came to the sale with all those impressions on his mind, and but for the testimony of the defendant's witnesses, this witness would never have doubted that he gave utterance to those sentiments.

*Cross examined,* admits he was excited and agitated when he made the statement. Since the filing the bill before mentioned, knows of no other action by plaintiff, Moseley, to stop the sale.

Defendant then called Doctor *John G. Gamble, Jr.,* who being duly sworn, said, was present when Mr. Archer got up, was near him. He said in terms that the widow had not released her dower, and persons were notified of the fact, and would purchase at their peril. Mr. Thompson arose, and said in reply, that the question had been settled against the claim of dower, and the title was good.

Both parties here closed their evidence.

And the cause having been fully argued by counsel on both sides, his Honor the Judge instructed the jury as follows, to wit:

1. The judgment and execution under which the slaves were sold are wholly void, and gave no authority, and no right of property passed by the sale.

2. That the judgment and execution being against administrators who had been removed from office, it is the same as if there had been no judgment nor execution.

3. That defendant must be regarded as having purchased with knowledge of the title, is affected with notice of the illegality of the sale, and stands in the position of the Union Bank, the plaintiff, in the sale, and of the administrators who had been removed, getting

29

their title, and no other.  Unless the jury shall be satisfied that the administrators of Parkhill, at the time of the sale, wilfully, deliberately, and of their own free accord and consent, agreed to waive the objections to the sale, and to affirm its validity, and that purchases were mainly made on the faith of such conduct, action or admission, and not relying on the legality of the sale, or if the jury are satisfied that Ponder would have purchased without reference to any statement or conduct of the administrators at the sale, then there is no bar to the recovery of plaintiffs.

4.  That if they are of opinion there was fraud on the part of the plaintiff, or a disposition to entrap, or mislead, or deceive purchasers in their action and conduct, they must find for defendant.

5.  That if they find that such advice and conduct proceeded from one administrator, and not from both, that this is not to be regarded as conclusive, but that the action of that administrator shall be preferred which is most favorable to the estate.

6.  That if they are satisfied that this admission and conduct were the effect and result of the party's convictions as to the obedience due to the decision of the Court after the applications made by the party to arrest the judgment, and the sale by the officer, under the impression that the Court had rightly decided, that such action and such conduct will not estop the parties from asserting their rights and interests, on discovering that the Court was wrong, and the judgment and sale a nullity.   That a defendant is bound to respect the decision of the constituted authorities, and this obedience, and a conduct and action consistent therewith, is not to be taken as the free act of the party, to estop him from asserting the truth afterwards.

7.  That if the jury are of opinion that the action and conduct of administrators proceeded from a desire not to obstruct or thwart the action of the Court, or from a disposition to prevent the injury that would arise from a sale of the negroes at a reduced price, in case the judgment and execution might turn out to be valid, and with no disposition to entrap purchasers, then that such action and conduct are not wilful, and do not estop plaintiff from recovery.

8.  That after the applications to the Court by Moseley to arrest the sale, and in opposition to the judgment and execution, it was not the duty of the administrator, Moseley, to give notice or protest at the sale, or to take any part—that, as to the judgment, execution and sale, he must be considered as having been adjudicated

as no representative, or a discredited representative, and his action afterwards must be regarded as that of an individual, and not to affect the estate.

And thereupon the said defendant prayed the Court to instruct the jury in his behalf as follows, to wit :

I.  That if the jury believe from the evidence that the slaves sued for went into the possession of the defendant, with the consent of the said plaintiffs, or either of them, express or implied, then that such bailment implies an agreement by defendant to re-deliver upon request, and that no action can be maintained, except after demand and refusal by defendant to re-deliver.

II.  That there having been no evidence whatever of a demand on defendant before suit brought for the return of this property, the plaintiffs are not entitled to recover.

III.  That the plaintiffs in this action being strangers to the judgments on which the executions in evidence issued, and under which the sale by the marshal was made, are not allowed in this action as against this defendant, a purchaser at such sale, to set up that such judgment was and is void, nor to impeach the same collaterally.

IV.  That to support the title of a purchaser at marshal's sale as against the defendants in execution, it is enough that he shows a judgment of a court of competent jurisdiction, and that a sale was made by virtue of an execution of the kind the statute prescribes ; and to support the title of such purchaser as against the plaintiffs in this action, or strangers to that judgment, upon the allegation of title in such plaintiffs, then that a sale of the property by such marshal, in the presence of such alleged owners, without objection on their part, estops the plaintiffs from impeaching the transaction on the ground of their better title.

V.  That, if the jury believe from the evidence that William D. Moseley, administrator *de bonis non* of Sam. Parkhill, deceased, one of the plantiffs, had sole possession of the negroes in controversy before the time when defendant became possessed of them, then that even if the slaves had been wrongfully taken by defendant out of his possession, the said Moseley could bring an action alone and in his individual name for the slaves, and that the said Moseley cannot defeat any defence of defendant against him alone, and in his individual capacity by joining his co-administrators and suing jointly as administrators.

VI.  That if the jury believe from the evidence that the negroes

in controversy were offered at public sale in May, 1845, and that on that occasion the said plaintiffs, or either of them, knowing their title, stood by and did not forbid the sale, and that defendant thereupon purchased the negroes under the supposition that the title was good, then that the party so standing by and being silent will be bound by the sale, and is estopped from asserting the title in himself.

VII. That if the jury believe from the evidence that plaintiffs or either of them stood by and saw the property now sued for, sold to the defendant at public sale, as the property of another under an erroneous opinion of title, without making known their title, then that plaintiffs will not be permitted afterwards to exercise their legal rights against such defendant.

VIII. That if the jury believe from the evidence that the plaintiffs or either of them have made admissions and declarations which are clearly inconsistent with the claims they now propose to set up —that the defendant acted on the admissions and declarations so made, and that defendant will be injured by allowing the truth of such admissions and declarations to be disproved, then that the plaintiffs are estopped from setting up an adverse title.

IX. That if the jury believe from the evidence that William D. Moseley, administrator *de bonis non*, of Samuel Parkhill, one of the plaintiffs in this action did heretofore and before the said sale shown in evidence, send one of the slaves in controversy to the defendant, making known to him that said slave was about to be sold recommending him to purchase such slave at the time and place where the sale afterwards took place, that he Moseley would buy the slave but for lack of means, that by reason of such recommendations and suggestions Ponder attended the sale, that at such sale upon suggestion made about the title, Moseley said there would be no difficulty, that at said sale Moseley was present giving a sanction to the sale, aiding in its execution, encouraging bidders, both by declaring values and qualities of slaves, as also by bidding for slaves himself, and that defendant purchased the slaves he bid off on the faith of such acts, understanding that he was getting a good and valid title to the slaves, then the said Moseley is estopped from setting up tittle in himself against said defendant and plaintiffs cannot recover.

X. That the relations which exist *between* the Union Bank of Florida and the estate of Parkhill have nothing to do with this suit, nor are the bond holders parties to this action, nor do these things enter into the decisions of the issues in this case.

XI. That if the jury believe from the evidence that before and at the time of the sale shown of the slaves in controversy, said Moseley the plaintiff well knew said sale was to be made under an execution which is now shown to have had no power to touch the property in question, and that yet notwithstanding Moseley allowed the sale to proceed without claiming the property as his own as administrator *de bonis non,* but declared the title proposed to be sold by the Marshal good, and that there would be no difficulty, then that such conduct of said Moseley as administrator *de bonis non,* was and is, as against the defendant a purchaser at said sale an adoption by Moseley administrator *de bonis non,* of that sale as his own, and estops him from setting up that no title passed by said sale. That such alienation is equal in effect to an original conveyance.

XII. That if the jury believe from the evidence that Moseley, one of the plaintiffs, bid for property sold at sale by the Marshal, then that such act was an encouragement to all persons present to bid at said sale, and precludes him from denying its legality.

XIII. That if the jury believe from the evidence that the declarations of Moseley, administrator *de bonis non* of Samuel Parkhill, on the day of the sale were made to the bystanders after the manner of one having authority and control, and directing the sale, then the jury have a right to consider the said sale as made by him in his character of administrator *de bonis non,* and that a good title passed to the purchaser which he cannot gainsay or resist.

XIV. That even if the plaintiffs and defendant are equally innocent, then that the rule is, that if one of two innocent parties is to suffer, he is to suffer whose first action and conduct causes the mischief, and that the purchasers at this sale are not to lose their money and their slaves, if the loss would fall upon them, either by the culpable negligence of Moseley or by his omission to assert an adversary title at a time when he knew the same.

All which said instructions the said Court refused to give to the jury, but in reference to the tenth prayer for instruction, instructed and charged the jury :—

That the property in question could not be sold under execution by the Union Bank of Florida, except as a Trustee for the Bondholder, and that Ponder is not a purchaser without notice : That until the expiration of the time limited in the mortgage, the Bank cannot sell the slaves under a judgment at law for a debt of its own.

To all which said several rulings, decisions and judgments of the said Court during the trial of this cause, to the instructions given to the jury and to the refusal of the said Court to instruct the jury as prayed by defendant, the said defendant excepts, and forasmuch as the said matters excepted to do not appear upon the records of said Court, tenders this his bill of exceptions, and prays that the same may be signed, sealed, and made a part of the record.

*Higner*, for Appellant :

1st. What must a purchaser at sale of Marshal show to protect his title ?

1st. *As against defendant in execution.*

It is enough that he shows a judgment of a Court of competent jurisdiction, and that a sale was made by virtue of an execution of the kind the statute prescribes.

1 Blackford's Rep. 210.   1 Hill's S. C. Rep. 239.   3 Scammon, 110.   4 Scammon, 370.   3 Wash. C. C. Rep. 546.   1 Overton, 283.   3 Cranch, 300.   1 Monroe's Rep., 94.   6 Har. & John., 182. 11 Gill & John., 217.   2 Bibb's Rep. 202.   2 Bibb's Rep. 518. 6 Gill & John., 298.   8 Missouri, 257.   Though reversal of the judgment the defendant shall not have restitution of the goods.

5 Coke, 90—42 Eliz.   8 Coke 94.   Cro. Eliz. 278.   Cro. Jac., 246.   1 M. & S., 425.

But the value of them for which they sold.

The aforementioned cases, and 2 Saunders 101.   1 Taunton, 359. 6 Cowen, 297.   1 Washington Rep., 116.   2 Munford, 272, and 4.   3 Bacon's Abridgement, Title Error, p. 390.   6 Peters, S. C. Rep. 8.   10 Peter's S. C. Rep., 475.   1 Harris & John., 405.

2d. *As against a stranger*, who claims title, we insist that a sale of the property by such Marshal, in the presence of such alleged owners, without objection on their part, *estops* them from impeaching the transaction, on the ground of better title.

As to estoppels and laws of the same :—

· Co. Littleton, 352 a.

Regarded with favor by Courts at this day :—

2 Smith's Lead. Cases, 459, 460, 467.   3 Hill's N. Y. Rep., 220.

And this favor is extended to them *on principle, and as a rule of policy.*

Same authority last cited, 219, Cowen, J.  2 Starkie on Evidence, p. 28.  1 McLean R. p. 163, 388, 390.  1 Story's Equity Jurisprudence, 387—note 4.  5 Ham. Ohio R. p., 124.

Acts of estoppel.  1st. Standing by and giving a sort of sanction to the sale.

6 Adol. & Ellis, 474.

In that case, Lord Denham uses this language:

" But the rule of law is clear, that, when one by his words or conduct, wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time; and the plaintiff in this case might have parted with his interest in the property, by verbal gift or sale, without any of the formalities, which throw technical obstacles in the way of legal evidence.  And we think his conduct in standing by and giving a kind of sanction to the proceedings under the execution, was a fact of such a nature, that the opinion of the jury, &c., ought to have been taken, whether he had not, in point of fact, ceased to be the owner."

And the same Judge, in the case of Gregg *vs.* Wells, 10 Adolph. & Ellis, 90, says:

" Picard *vs.* Sears was in my mind at the time of the trial, and the principle of that case may be stated *even more broadly*, than it is there laid down.  A party who *negligently* or *culpably stands by*, and allows another to contract, on the faith and understanding *of a fact which he can contradict*, cannot afterwards *dispute that fact*, in the action against a person whom he has himself assisted in deceiving."

To the same effect are the following cases:

2 Devereux's Rep., 179.  9 Cowen, 275.  19 Wendell, 563.— 1 Fonblanque's Equity, ch. 3, sec. 9, p. 163.

2d. They were silent when they ought to have spoken, and will not be allowed to speak now.

Robert's on Frauds, p. 130.  2 Vernon's Rep., 151.  1 Story's Equity Jurisprudence, sec. 385, p. 387.  2 Vernon, 370.  16 Maine, 146.  10 Adol. & Ellis, 437.  21 Maine, 137.  7 Watts, 163.— 5.Call Rep., 463.

3d. The active agency and participation in the sale by the plaintiffs in this action:

6 Adol. & Ellis, 475. 9 Barn. & Cress., 577. 3 Barn. & Adolph., 313. 10 Adolph. & Ellis, 90. 1 Barn. & Adol., p. 142. 9 Cowen, 275. 4 Metcalf, 381. 21 Maine, 130. 2 Murphey's Rep., 6. 3 Hill's R. p., 215.

In same case, Bronson, J., dissenting upon his view of the facts, declares the law of estoppel by admissions.

1st. The admissions must be clearly inconsistent with the evidence proposed, or title to be set up.

2d. That the other party acted on that admission.

3d. Injury, if allowed now to disprove. And the judge lays down as the sum and substance of the whole—"The facts and admissions operate against him in the nature of estoppel, when *in good conscience* and *honest dealing*, he ought not to be permitted to gainsay them."

*We are content with this exposition of the law.*

On the same head :—

7 H. & J., 337.  1 H. & McH., 146.  8 Yerger, 388.  4 Munford, 129.  4 Paige, C. Rep., 94.

Under 3d head, of active agency and participation in my brief advert to record and facts.

It is, shown—1st. That the plaintiffs were not only not forbidding the sale, but taking the active *charge, management, and control.*

2d. When bidding was chilled by the effect of Archer's announcement, Moseley said "bid—I don't want the negroes sacrifised—I will be glad when they are off my hands." After this, says the witness, the negroes sold better.

3d. The statement by Moseley to the parties, on their objections to title, by assurance "that all was well," was of itself an open declaration of the strongest kind—an admission calculated to remove any impression, if such had before existed, that the sale would be disputed.

4th. Manly's act in encouraging the sale, by having Bloxham act as a bye-bidder, is a gross fraud, if this sale can now be set aside.

5th. The declarations by Moseley that the title was good, encouraging bidders, addressed to the bystanders, was calculated to have effect, and is proved to have had distinct effect, on the general sales; and because every defendant is entitled to the benefit of such declaration, according to the rule laid down by Lord Denman. If, in-

deed, the mere standing by and giving a sort of sanction by that act alone to the proceedings, is declared by Lord Denman to be an act of such a nature, from which the jury can infer that the plaintiffs had ceased to be owners—how much more potent is Moseley's bidding for the property ?—does it not utterly repel the idea of then existing title in himself ?   The bystanders were entitled to put faith in his conduct—and doing so, men were deceived and induced to alter their previous position, to part with their money, and instead become owners of these negroes—and now great mischief and injustice would be caused, by permitting the plaintiffs to withdraw from the positions they then assumed.

6th. These slaves were knocked off to the purchasers, in the presence of Moseley and Manly, before they had paid their money. Had they spoken out then, and claimed title, these defendants might have refused to complete the purchase.   They were silent when they ought to have spoken, they will not be allowed to speak now. But they were cognizant of the transaction, and did nothing to prevent it.

II.  Are the plaintiffs in this action *strangers*, or were they parties or privies *to the former judgment of the Bank ?*

The plaintiffs, however, would fain anticipate such an inquiry, and insist that that judgment was and is *absolutely void*.   Now, was that judgment void, and a mere nullity ?

*First*, It was the judgment of a Court of *competent jurisdiction*— the parties sued were yet before the Court—the subject-matter was also within the jurisdiction—the parties plead in bar of the action.

5 Cranch, 185.   6 Peters, 16–17.   3 Cranch, 306.   2 Peters, 163.   10 Wheaton, 192.   10 Peters, 468.

*Second.*  The judgment was reversed *mainly* because two pleas remained open, undecided.   The Supreme Court plainly regarded the judgment as *erroneous* merely.

1 Florida Reports, 110, and this was the correct view.   Viner's Abridgement, (Judgment G. A.,) contains the following strong case :

If *præcipe quod reddat* is brought against my father, who dies pending the suit, and I enter as heir, and after judgment is given against my Father, and the Demandant enters, I shall not have assize, for the judgment *against a dead person* is not void, but error, *quod nota.*

Thus, then, if the old administrators had been " actually," instead
30

of "civiliter" *mortui*, their death would only have rendered the judgment erroneous, or voidable, and not void.

If not a void judgment, but conclusive until reversed, on *parties and privies*, then the question recurs, are these plaintiffs STRANGERS TO THAT JUDGMENT?

Manly *et ux.* were parties to the suit—duly served with process as *administrators*. They plead *in bar* amongst other pleas, *their discharge*—it is replied to, and on demurrer to rejoinder, judgment was given for plaintiff.

When plea pleaded, *Manly and wife were administrators de bonis non.* This was shown in the pleadings, and is as well as if in proof. Judgment against them, therefore, was good, until reversed. 1 Levintz, 261. 2 Levintz, 190. 1 Lord Ray., 63. Comberback, 220. Lord Raymond, 265.

Two of these plaintiffs then were parties—the third privy in estate. 1 Flor. Rep., 110. Cro. Car., 167. 8 Cowen Rep., 343. The property seized and sold was the property of the estate.

III. But be the judgment in favor of the Bank void, an utter nullity, to which these plaintiffs were neither parties nor privies, how do they stand in relation to the judgments and executions against Manly and wife, administrators of Parkhill, deceased?

*These judgments are unreversed and are irreversable*—and being so cannot be declared a nullity by any authority of law. 10 Peters, 473.

The sales were made under these executions and judgments as well as that of the Union Bank.

We have thus established, we believe, that the purchasers at these sales show enough to bar a recovery; they show valid judgments of a Court of competent jurisdiction, and that sales were made by virtue of executions of the kind the statute prescribes.

If, on the other hand, these plaintiffs are regarded as strangers, whose property was sold on that occasion, they are estopped from impeaching the sale on the ground of better title.

IV. As to specific errors assigned.

1. The introduction of revocation of letters.

2. The introduction of mortgages of Union Bank.

3. The introduction of Bill in Chancery *against no party*, praying process against no one.

These were all "*res inter alios acta*,"—the Bill in Chancery is relied on by the Judge in his 6th charge. The instructions of the Judge are erroneous. In argument we will advert to them.

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

The instructions prayed by defendant below should have been given.

The 1st and 2d instructions asked require reference to authorities. We are satisfied they can be upheld. The counts here are two.— *One* on special bailment—*the other* on supposed finding. The second count can only be sustained upon proof of possession obtained wrongfully without pretence of bailment. 4 Bos. and Puller, 145.

In the case at bar, the possession was with the consent of the plaintiffs, either express or implied. The proof, then, being of bailment, recovery must be on *first* count, or not at all. 4 Bos. & Pul., 351. Buller's N. P., p. 139. 1 Chitty's Plead., 141.

. In actions of detinue, *the detainer* is the gist of the action, and upon general principles, where there is no certain debt or obligation due, but a mere collateral engagement or duty, the plaintiff must lay a foundation for his action in a special demand. 1 Saunders, 32 n. 6 Comyn's Digest, Tit. Plead., c. 69, 73, pp. 84 & 85. 5 Term Rep., 409. Buller's N. P., 151. 1 Chitty's Plead., 362–3. Lowes on Assumpsit, pages 232, 236, 238, 241.

In the case of Bemers *vs.* Howard's Ex'rs, Taylor's Rep., 149, (1 Iredell's Dig., 146,) it is said, " on a promise to deliver goods, a demand before action is indispensably necessary." 5 Hill, 37.

Also p. 143 to same point. Story on Bailment, p. 82, sec. 107. We cite also—24 Wendell, 203. 6 B. & C., 464.

The plaintiff must have a right to the immediate possession of the thing detained—if returnable on demand, he has no such right until demand refused. Archbold N. P., 287, 290, 292, 295. 2 Tucker's Commen., p. 81. 2 Mumford's Rep., 122. 2 Stephens N. P., p. 1313. 2 Selwyn's N. P., 543.

The 3d and 4th instructions have been already presented in argument.

On the 5th we recur to evidence of sole possession of Moseley in the record, the inventories and appraisement, and the bill of complaint of Moseley.

A full right of action was in Moseley alone, (1 Williams on Ex'rs 653, note c. and authorities,) and we insist he cannot defeat any defence by joining co-plaintiffs in this suit.

See this attempted in 5th instruction of judge, and his refusal to grant all those instructions looking to Moseley's sole action.

VI, VII, and VIII require no further illustration.

Under 9th instruction arises a view of the case we think perfectly fatal to recovery of plaintiffs.

Was there not a valid sale of the negroes made by William D. Moseley, administrator *de bonis non*? He had full power over the estate. 1 Monroe, 96. Ram. on Assets, 608, N. E., and authorities. 4 D. & E., 632. 2 Vesey, 267. 1 Atkyn's, 463. 2 Bingham, 177. 1 Will. on Ex'rs, (670, N. E.) 1 Lomax on Ex'rs 344. 1 McCord's Rep. 492. 1 Wendell's Rep., 583.

Only exception is where there is collusion between the purchaser, or mortgagee, and the personal representative.

2 Williams on Ex'rs 672, (N. E.,) co-executors regarded as one person. 2 Williams Executors, 683, (N. E.)

Antiquated distinction between administrators and executors, in respect of their full authority, done away. 1 Wendell's Rep., 583.

The 11th and 12th instructions present same points of view with that last considered.

The 10th would seem a self evident proposition, yet the very converse has been assumed by the Court below.

The 14th instruction was properly applicable, and ought to have been given. Had it *alone* been given, plaintiffs never could, *as they never ought,* to have recovered.

*Archer,* for Appellee :

The introduction of the record, containing the order of dismissal of Mrs. Manly as administratrix, was pertinent to the issues, because it contained evidence to show that the judgment *subsequent* to the revocation was void, and that the sale was consequently also void.

The mortgages executed by Parkhill to the Union Bank, when he became a stockholder, to secure his subscription, were also properly received in evidence, as they embraced the slaves in question, and were of record in Leon. So long as these mortgages were outstanding, the property was not subject to sale under execution at law.

The bill praying an injunction on behalf of Moseley and his securities, was properly received in explanation of Moseley's conduct at the sale. It showed that he had exhausted his remedies before the Superior Court, before the supposed acquiescence was given—and that he did not, except as a necessity, yield his claims to the property.

William G. Ponder *vs.* W. D. Moseley and others, Administrators.

The 1st and 2d instructions given by the Court were correct, as upon the facts exhibited by the record the judgment and execution were void, and as a consequence, no title passed to the purchaser. Griffith *vs.* Fraser. 3 Pet. Cond. S. C. Rep. 1.

The other instructions mostly depend upon the doctrine of estoppel *in pais.* The rule governing estoppels of this character, as given by Lord Denman, and adopted by our Supreme Court, in Cotten *vs.* Williams, 1 Fla. Rep., 54, is this :—" Where one by his words or conduct wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time." The following requisites, therefore, are necessary to constitute an estoppel of this character : 1. The subject-matter of the belief induced must be a state of *things—facts*, and not opinions.—Polk's lessee *vs.* Robertson, 1 Tenn., 463. Craig *vs.* Baker, Hardin Rep., 281.

2. The party to be estopped must not only cause the other to believe in a state of *facts*, but he must *wilfully* do it. That is to say, he himself must not be deceived—there must be imposition.— Moore *vs.* Hitchcock, 4 Wend., 292. Ibid., 480. 5 Pick., 452. 2 Conn., 467. 10 Alab., 278, citing 2 Baily, 581.

3. The party claiming the estoppel must have acted upon the statements of the other party, and altered his position. He must not be informed of the facts from any source—he must have been deceived, and must have acted upon the deception differently from the action he would have taken had he not been deceived.

4. The party to be estopped must be seeking to establish a different state of facts as existing at the same time. That is to say, he must be seeking to contradict himself as to *facts*, which the law will not permit him to do. He must be seeking to recover upon his own falsity.

It requires a combination of all these requisites to make up an estoppel of this kind—and if the facts of this case show a failure of either, the appellees are not estopped. A reference to the facts without any comment on them, will be sufficient to convince us that not one of these requisites can exist in this case.

The instructions given by the Court, when tested by these principles, will be found scarcely to give the appellees the full benefit of the doctrine of estoppel, as applicable to the facts of this case.

As to the 1st and 2d instructions *refused*, there was a wrongful and tortious taking of these slaves by the officer—and where this is the case, no previous demand is necessary to maintain detinue.

' As to the 3d and 4th instructions *refused*, the Court did not err, if we are correct in the position that the judgment is void, by reason of being rendered after the dismissal of Mrs. Manly, and while her successors in office represented the intestate. See Griffith *vs.* Fraser, above cited. Taylor *vs.* Savage, 17 Peters, 224. 1 Fla. Rep., 130.

The execution commanded the officer to make the sum recovered of the goods and chattels, &c., of S. Parkhill, in the hands of the original administratrix. This writ was executed by a levy on the goods, &c., of S. Parkhill, in the hands of the administrators *de bonis non.* If this can be legally done, as a consequence the securities of the last administrators would be liable to the *devastavits* of the first—this " never could be right." 2 Call, 41, 56.

*Brockenbrough*, for same :

As to sales under void judgment and execution, see case cited by Mr. Hagner. Armstrong *vs.* Jackson, 1 Blackford, 211.

A judgment must be produced. Den. *vs.* Wright, et al., 1 Peters C. C., 67. Campbell et al. *vs.* Browne and wife, 6 Howard, (Miss.) 112. Ventris et al., *vs.* Smith, 10 Peters, 173–4–5–6.

*Bona fide* purchasers for valuable consideration without notice, acquire no title when the party selling has no right to sell. And this may be either by revocation of letters, or non-compliance with statute.

No one but executor or administrator can sell. Hence if he who is not executor or administrator sells, it is non-compliance with statute. So revocation is in fact a non-compliance with statute. See Thomp. Dig., 202, sec. 2, as to sales, &c. Denning *vs.* Corwin, 11 Wend., 652. Hollingsworth *vs.* Barbour, et al., 4 Peters, 470.

Record must shew jurisdiction of the *party* by *notice* or *publication*, where publication is lawful. Also 3 J. J. Marshal, 105. 1 Florida, 127.

But here the execution was invalid on *its face*. Woodcock *vs.* Bennett, 1 Cowen, 739.

The levy was bad, because it did not follow the execution. Moseley's appointment and inventories shewed the property not in hands of Manly and wife as administrators.

William G. Ponder, *vs.* W. D. Moseley and others, Administators.

*Bad* because levied on property *mortgaged*, and mortgages recorded. Bad because the property is mortgaged, and mortgages are a security for ultimate payment of Territorial bonds. Bad because the property by the charter, is to remain in possession of mortgagor until forfeiture, and the charter is notice. It is a public act.

As to the question of estoppel in *pais*, Lord Denman's Rule, 6 A. & E., 475, in Pickard *vs.* Sears, adopted by this Court in Cotten *vs.* Williams, 1 Florida, 54, is in these words: " The rule of law is clear, that, where one, by his words or conduct, wilfully causes another to believe in the existence of a certain state of things, and induces him to act on that belief so as to alter his own previous position, the former is concluded from averring against the latter, a different state of things as existing at the same time."

In Gregg *vs.* Wells, 10 Adolph. & Ellis, 90, [37 Eng. C. Law,] Lord Denman says that rule may be laid down more broadly, thus: " A party who negligently or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute that fact in the action against the person whom he has *himself* assisted in deceiving. The defence here is in substance *collusion* between Denham and the plaintiff."

1st. In examining this rule the first question is this, can 'one' estop a whole 'party' by his words or conduct in which they do not participate—can one estop several ?

2d. Can a man, acting in his own right, estop himself acting in *another right*, or *vice versa*, must not both acts or pieces of conduct be in the same right or capacity.

3d. If he can estop several—and if by his individual acts he can estop himself in *auter droit.* Still can he by himself estop by his individual contract, the acts of himself and *others in auter droit.*

Fraud, imposition, deception, are the ground works of all estoppels *in pais.*

If one man can estop several, a fraud may be worked by the doctrine upon innocent parties for the benefit of a stranger or purchaser, a volunteer, which would be wholly inadmissible ; *caveat emptor* should apply. The *fraud* is more palpable, and the law against the stranger more palpable when *he knows* there are several in interest, and only sets up the words or conduct of one.

Fraud is the essence of estoppel *in pais,* and where it would work fraud it is never permitted. 2 Smith's Leading Cases, Am. ed., 467.

To make the admissions of one, even *receivable* against several there must be *not a mere community of interest*, but a joint interest. 1 Greenleaf Ev., 209, sec. 176, and cases cited. And the first case cited, shows executors interest to be *a community* and not *joint*. For admissions (says he) of one executor cannot be received to take a case out of the statute of limitations against his co-executor, citing Tullock *vs*. Dunn, R. & M., 416, and Hammon *vs*. Huntley, 4 Cowen, 495, in which case an acknowledgement in writing by 2 of 3 executors was held inadmissible, because it might involve the other in a *devastavit*.

So the admission of receipt of money by one trustee will not bind the rest. Davies *vs*. Ridge and others, 3 Espinasse, 101–2. Lord Eldon puts it on the ground that they are *trustees* and says if individually liable, they would be bound.

So in Doe *vs*. Brown, 4 Cowen, 492. The admission of one tenant in common in the same suit, is not admissible against his co-tenants and co-plaintiffs. The Court says: "But it would seem an unjust rule which would suffer one tenant in common, to admit away the rights of others. As far as I have been able to discover an admission by a party to the record is evidence against him who makes it, and where there are partners against them also, but not against others who happen to be joined as parties to the suit. The cases which speak of the admission as proper evidence, will be found to have reference to a sole *plaintiff* or *defendant*." Such an admission was not held in that case ground enough to admit, "secondary evidence of contents of a will."

2. As to parties acting in *auter droit;* the very examples cited under first head to show that *one* cannot estop *several*, are still stronger to show that he cannot do so in *auter droit*. The case in Espinasse of co-trustees is put on that sole ground. And in the executors case in R. and M., and Hammon *vs*. Huntley in Cowen, it is put on the ground of their being executors, and that one might force others to be guilty of a devastavit—that is, might be made by the rule, to be guilty of fraud on the others. But see further, 1 Greenleaf, 211 and 179. "Admissions of a *guardian* or *executor* or *administrator* before completely clothed with the trust, or of a porchien amy, before commencement of suit, cannot be received either against ward or infant in the one case, or *against himself* as the representative of heirs, devisees and creditors in the other, though it may *bind the person himself*, when he is afterwards a party *suo jure* in another

JANUARY TERM, 1848. 241

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

action." Why? Clearly because the admission cannot be *qua executor, &c.* Cannot be in *auter droit*—and so if made as an individual after investiture with those powers, it could not bind him, and *a fortiori* not bind others in *auter droit*, for the same reason ; and *ubi eadem ratio est ibi idem lex.* See also 4 Perry and Davidson Rep. 1 to 9, Fox *vs.* Waters. Admissions by one co-executor not made *qua* executor not binding on his co-executor. 2. Executors interests not *joint.* 3. Opinion or admission of a matter *of law* as the legal effect of a deed, could not bind a co-executor even in a case where it might in a matter of assets. (In our case it was a supposed judgment instead of a deed.)

3. If I have sustained either of the two first propositions in the negative, then a negative must follow upon this. But having established both—that one cannot estop several, unless their interest is entirely *joint* (as partners) and that one acting in his own right cannot estop himself in *auter droit* (especially against one knowing the capacities in which he acts,) it follows *a fortiori* that one acting individually cannot estop several in *auter droit.* If anybody was deceived, it was by him as an individual, for which he must have an action for *deceit* if he can show *fraud* and *damages* sustained by it.

A party acting *bona fide* may bind estates, &c. But can an executor impress his *fraud* upon the *property of the estate ?* He may bind *himself* by fraudulent representations, but can he thereby create a *devastavit* and affect *his sureties*, his co-executors, the widow, distributees and creditors? His sureties cannot be affected by his *mis-pleading* though matter of record. Thomp. Dig. 211, S. 4 and S. 5. He is charged as of his own estate, with a *devastavit*, if he cannot prove that he has duly administered *according* to law, if assets have come to his hands.

And see Thomp Dig. 358, S. 6. When a sale is made of lands or slaves by execution, a deed or bill of sale shall be made, and if more money is made than the execution demands, it shall be paid to the *defendant* without delay.

The defendants in execution not being the administrators in this case, the property would be given away.

Suppose then Moseley had designed and perpetrated a *fraud* on Ponder, that fraud would be his own act. He cannot commit fraud *qua* administrator. He cannot give opinions on titles *qua* administrator. His powers are only to administer according to law. These

31

do not extend to letting property go to purchasers at a void sale, on a judgment *vs.* nobody, by giving an opinion that the title was good, or " that there would, he thought, be no difficulty." The most rational supposition is that he was himself deceived, as well he might be, by the perseverance of the Court—the zeal of the Marshal—the energy of the executioners—the eminent authority and positiveness of all counsel except his own, and the greedy avidity of purchasers —and the universal *opinion* of the crowd, (as Ponder testifies).

If I have laid down the law correctly—parties could not be *deceived*, because they were bound to know that law, and they had no right to act upon any such declarations. They would be estopped by the law from saying they acted upon such declarations, for they would be bound to know that they could have no effect. Coles, &c., Executors *vs.* Bank of England, 37 Eng. C. L., 134. An *executor* who had committed forgery not estopped by that, but by gross negligence of testator. And in Davis *vs.* Bank of England, misprison of Felony in *concealing* forgery by which his own stock was sold, did not estop him from recovering the stock. 9 Eng. C. L., 452. See 1 Stra., 20.

But to return to Lord Denman's rules, the 2d question under them. " By his words or conduct *wilfully* causes another to believe in a certain state of things, and induces him to act on that belief." Or in Gregg *vs.* Wells. " Who negligently or culpably stands by and allows another to contract on the faith and understanding *of a fact* which he can contradict."

The gist of this is plainly, *deceit, fraud.* It must be wilfully or negligently or culpably, and it must be *in a fact*, and the party must not act on his own independent knowledge. He must be induced to believe the fact. He must not believe it before or be induced by others to believe it. It must be a case where *his contradiction* of the fact, would at once induce the party not to act.

A promise, an agreement, a covenant, (though that might in some cases to avoid circuity estop the party by deed,) will not estop the party *in pais.*

1. The party must believe *the fact* and *act upon it ;* upon this ground rests : The Pres. Con. of Salem *vs.* Will., 9 Wend., 148.

The party must act on the belief, Wallace *vs.* Truesdale, 6 Pick., 457. A party averred property to be that of a 3d person, to prevent a sale, but the sale went on. He was not estopped from suing for it. Welland Canal Co. *vs.* Hathaway, 8 Wendall, 486.

2. When the party stating *the fact* is himself mistaken, then there is no fraud,—the " wilful"—" culpable" and " negligent" are wanting, he is not estopped. Thus in Nichols *vs.* Arnold, 8 Pick., 174, a party was not estopped by declaring he was not a *creditor* of an insolvent firm, and declining to become a party to their deed of assignment, under the supposition that a sale made to them in his behalf by auctioneers, had been *guarantied* when in fact it had not. On the same ground that the *parties have participated* in a common *mistake.* A party was not estopped from claiming from his co-surety his half of money recovered from the principal, though he had *testified* as a witness in behalf of his co-surety *vs.* the principal, and thus enabled him to recover the whole debt as his own. Doolittle *vs.* Dwight and another, Administrators. 2 Metcalf, 566.

3. It must be the enunciation of *fact* and not of *opinion of law.* Thus in Kimberly *vs.* Ely, 6 Pick., 451. Even accepting a dividend under a void insolvent law of Mass. did not preclude the party from recovering all the remainder of his debt in New York, though the insolvent law purported to give absolute discharge.— See opinion of Lord Denman himself in Fox *vs.* Waters, 4 Perry, 2 Davidsons, 7, cited.

Polk's lessee, *vs.* Robertson, 1 Term, 463. So opinion as to the legal effect of a contract (here it is a judgment.) Bost. Hat Man. Co. *vs.* Massenger, 2 Pick., 223. " But the testimony was immaterial ; since the confession of a party as to the legal effect of his contract cannot bind him, it surely ought not to bind others, who may be joined with him."

So Craig *vs.* Baker, Harden's Reps., 281–3–4–9. A party was consulted as to a title, and pronounced it " as good as any on the north side of Licking," yet was not estopped from setting up his own which was better, after the party consulting him had bought under that opinion.

So admissions under a mis-apprehension of his legal rights do not estop. More *vs.* Hitchcock, 4 Wendall, 292, 298.

The party must contract on the faith and understanding *of the fact,* —he must be induced to act on that belief. Ponder does not pretend to this. He does not say it, when he might have said it, and it was his interest to say so, *if true.* He does not say he acted on Moseley's advice or in consequence of his declarations. But says " it was supposed that the *judgment* was *legal* and had a right to sell the property."

The *general opinion* was that all difficulty about the property had been done away.

It is clear from this and *the bill of sale* he took, whose title he thought he was buying (Camps) not Moseley's nor Mrs. Manly's.— There was no question of fact, it was all of law, whose title was the best, or in his own words had the judgment a right to sell the property ? Moseley's opinion could not affect the question, and it seems did not affect the *conduct of the party*. Unless that could be clearly shown, as Ponder might have done by his own testimony, it would be most absurd to say a party should be estopped by conduct or words which had *no effect*. The burden of proof is on Ponder to show that it affected him. Admissions have no effect unless they would produce some injury to the other party if permitted to be denied. See cases cited, 11 Hill & Cowen, notes, and Philips, 210. Estoppel of *receipter* is limited by this *test of injury*. It does not extend without the period or beyond the limits in which it would do injury to refuse the estoppel. Thus after delivery, receipter is not estopped, Johnson *vs.* Church, 12 Pick., 307. So it does not extend beyond the extent of the injury which might be effected by withholding it.— Thus though he cannot set up property in himself to defeat the receipt, he can do it in mitigation of damages, because by delivery he would have a right to bring trespass. Burley *vs.* Hamilton, 15 Pick., 42.

5. It is not necessary to give a party notice or information of that of which he is already advised. Woodcock *vs.* Bennett, 1 Cowen, 734.

"Process bad on its face," does not always mean that the irregularity appears in the writ—it may exist in a fact *aliunde*, as the party being dead, or "tested out of term." 1 Cowen, 739.

A party who purchases under a void judgment, knowing it to be such, is not a *bona fide purchaser* in the legal sense, and he need have no notice. Jackson *vs.* Caldwell, 1 Cowen, 644. Woodcock *vs.* Bennet, 1 Cowen, 734. Wood *vs.* Calvin, 2 Hill, 567–8.

"The general rule is, that a purchaser, under a power, buys at his peril, and, however innocent, cannot acquire a title without showing a valid subsisting power."

"Lawrence was not a *bona fide* purchaser. He had full notice that the judgment had been paid, and the debtor was not in fault in omitting to tell him, what he very well knew already."

"Knowledge that another party had a claim, is enough to put

JANUARY TERM, 1848. 245

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

the party on enquiry." He might have learned all about it by ordinary diligence. 1 Cowen, 642, Jackson *vs.* Caldwell. That interference at a sale does not amount to a consent to it. See Hearn *vs.* Rogers, 9 B. rn. & Cres., 577. 17 C. Law, 452. Willoughby *vs.* Backhouse, 9 Com. Law, 821. 8 B. & C., 821. 9 Eng. C. L., 252.

Lord Coke also lays down certain rules " to make the reader more capable of the learning of estoppels." 3 Thomas' Coke, 467.

1st. Every estoppel ought to be reciprocal, that is, to bind both parties.

If Moseley and Manly and wife, administrators *de bonis non*, were sued by Ponder in that capacity, for a debt *vs.* Parkhill's estate would he be estopped by this loose talk from saying *he did not buy of the administrators de bonis non*, but of Camp, and showing his bill of sale? See Welland Canal Com. *vs.* Hathaway, 8 Wend., 486.

A party dealing with a foreign Corporation by its name, is not estopped from denying its existence, and requiring strict proof and the best proof, because there is no reciprocity in such an estoppel.

2d. Every estoppel, because it concludeth a party to allege the truth, must be *certain* to every intent, and not to be taken by *argument* or *inference*.

Apply this test, there is no certainty. It is all argument, and only inference. And what is to be inferred? Even that is doubtful. It may be that Moseley thought Camp's title good, or that he would not sue. It is difficult to find what is to be inferred. There is no *allegation*.

Thirdly. Every estoppel ought to be a *precise affirmation of that* which maketh the estoppel, and not be spoken impersonally, as if it be said, ' *ut dicitur, quia, etc., impersonalitas non concludit, nec legat ; impersonalitas dicitur, quia sine, persona.*' Here the words are, " There would be no difficulty. He thought there would be no difficulty." Entirely impersonal, *sine persona.* It binds nobody— there is no affirmation.

Sixthly. ' Estoppel against estoppel doth put the matter at large.' Ponder having taken Camp's *title*, paid him the money,—taken slaves from him, and taken his title, as by law directed, in valid executions, is estopped from claiming the title of administrators *de bonis non.* If Moseley's loose conduct could estop him and Manly, how much more should these grave acts estop Ponder? 2 Murphy 6, Cross *vs.* Terlington. 2 Camp, 441, Holmes *vs.* Lipscombe.

Ellenborough was about to non suit a surgeon, who sued for fees because he had been called " Doctor," and signed prescriptions " M. D.," because a physician cannot sue for fees in England ; but when he found defendant had paid £3 13*s.* 6*d.* into Court, he thought that remitted the objection, and admitted his right to sue as *surgeon.*

Eighthly. Where the verity is apparent in the same record, there the adverse party shall not be estopped to take advantage of the truth ; for he cannot be estopped to allege the truth, when the truth appeareth of record.

*Thompson,* for Appellant :

We contend—

I. That the judgment of the Union Bank of Florida against Martha Ann Manly and Hiram Manly, administrators of S. Parkhill, deceased, and through which the plaintiff in error claims title, was not void, but erroneous merely.

It must be admitted that the late Superior Court of the District of Middle Florida had jurisdiction over the subject-matter of the suit, which was brought to recover a sum of money due on a single bill, made and executed by the said Parkhill in his life time. See Act of Congress of May 15, 1826, Sec. 1. Thompson's Digest, 597—Appendix.

. The power to hear and determine a cause is jurisdiction ; it is *coram judice*, whenever a cause is presented which brings this power into action. If the plaintiff states such a case, that, on a demurrer, the Court would render judgment in his favor, it is an undoubted case of jurisdiction. United States *vs.* Arredondo, 6 Peter's Rep., 709.

Tested by this rule, it cannot be doubted, that of the *subject-matter* of the suit, the Superior Court rightfully entertained jurisdiction.

But it is contended that every Court must have jurisdiction over the person of the defendant, and that, without notice, actual or constructive, one can no more be deprived of his property than he can of life, limb, or liberty ; and that the Superior Court had no jurisdiction over the person of the defendant, and, therefore, could acquire none over the subject-matter of the suit.

We admit that a judgment is inoperative and null, as against the

person who has not had notice, either actual or constructive ; but we shall contend and maintain that the defendants had notice of the institution of the suit, and submitted their persons to the jurisdiction of the Court.

The suit in the Superior Court was instituted by summons *ad respondendum*, which was duly served, and the defendants appeared.

The order of pleading which the law has prescribed and settled, and which the defendant is to pursue, is laid down, as follows :

1st. To the jurisdiction of the Court.

2d. To the disability of the person.

        1st. Of the plaintiff.

        2d. Of the defendant.

3d. To the Count or Declaration.

4th. To the writ.

        1st. To the form of the writ.

            1st. Matter apparent on the face of it.

            2d. Matter *dehors*.

        2d. To the action of the writ.

5th. To the action itself in bar thereof.

This, it is said, is the natural order of pleading, because each subsequent plea admits that there is no foundation for the former, and precludes the defendant from afterwards availing himself of the matter, as when the defendant pleads to the person of the plaintiff, he admits the jurisdiction of the Court—for it would be nugatory to plead that defence in a Court which has no jurisdiction ; and when the defendant pleads to the count, he admits that the plaintiff is able to sue him, and the defendant to be sued ; and when the defendant pleads to the form of the writ, he admits the form of the count; and after a *plea in bar* to the action, the defendant cannot plead in *abatement*, unless for new matter arising after the commencement of the suit.  1 Chitty's Pleading, 474.

The want of jurisdiction did not appear on the face of the proceedings, nor was any pleaded; but the defendants, after general imparlance, pleaded in bar of the action two pleas, viz : *non est factum* and *plene administravit*, on which issue was joined.  Wherefore, we say it was not a void judgment.  See Thompson *vs.* Tolmie, 2 Peter's Rep., 163.

All the cases cited by the defendants in error of void judgments, for want of jurisdiction of the person, are of the following character :

I. Where there has been no service of process, or any constructive notice upon the person sought to be charged by such judgment —as in Campbell *et al.* vs. Brown, 6 Howard Miss. Rep., 111— which was a case where the defendants had never been summoned, either actually or constructively.

Denning vs. Corwin, 11 Wend. R., 651—a partition suit, in which there was no service of process, personally or by publication.

Hollingsworth vs. Barbour, 4 Peters R., 472, was a proceeding against " unknown heirs," and an attempt to give notice by publication—the Court decided the record was no evidence that any such heirs existed, and the decree and deed made in pursuance of it could not avail to pass any title, without evidence that there were some heirs.

3. J. J. Marshal, 105—no service of process, nor any evidence of publication, in a chancery suit ; or

2. Where Courts of a special and limited jurisdiction have exceeded their powers in assuming control over persons not subject to their jurisdiction.

As in Smith & Shaw, 12 Johnson's R., 257—the case of a court martial assuming jurisdiction over one not in the military service of the United States, held to be a nullity.

Thurston vs. Martin, 5 Mason R., 498—where the assessors taxed one without their territorial jurisdiction, held to be an excess of jurisdiction and trespass maintainable against the collector, who imprisoned the plaintiff.

Perkin vs. Proctor, 2 Wilson R., 382—where commissioners of bankruptcy assumed jurisdiction over one who was not a trader.

Griffith vs. Frazier, 3 Peter's Cond. S. C. Rep., 1—where a Court of Ordinary in South Carolina assumed jurisdiction to appoint an administrator, because of the absence of the executor who had proved the will—which was held to be a void grant.

There is, we believe and contend, no room for doubt, but that the Superior Court of the Middle District of Florida had jurisdiction, as well of the persons of the defendants, as of the subject-matter of the suit, or action, at the time of the institution of the suit, and the filing the pleas in bar, &c., &c.

Now, when was the jurisdiction *ousted ;* or, rather, can a Court which has rightfully and properly obtained jurisdiction of a suit, both of the person and subject-matter be *ousted* by any matter, supervenient ? Can a matter of jurisdiction·be pleaded as having occurred

"since the commencement of the suit," or "since the last continuance?" It must be answered in the negative.

However, no matter of *jurisdiction* was pleaded, "*puis darrein continuance;*" but it is urged that the fact of the revocation of the letter of administration of Mrs. Manly, set up in the plea *puis darrein*, showed that she was *civiliter mortua*.

Mrs. Manly and her husband, however, still appear in Court by attorney, pleading the fact of revocation *in bar* of the action—the plaintiff continued prosecuting—both parties were fairly before the Court, and the question was upon the effect, or conclusions of law, upon the matter pleaded. The Court decided the question:—this Court has declared erroneously, and the error has been corrected by the reversal of the judgment.

No usurpation of power, no unwarrantable assumption of jurisdiction, appears in the proceedings of the Superior Court.

In Elliot *vs.* Pierson the Supreme Court decides, that "when a Court has jurisdiction, it has a right to decide every question that arises in the cause; and whether the decision be correct or not, its judgment until reversed is regarded as binding in every other Court." 1 Peter's Rep., 340.

But it is said Mrs. Manly was *civiliter mortua*, by the revocation of the grant of administration, and the judgment afterwards was a nullity. No greater effect can be given by the law to a *civil death* than to a *natural death;* and a judgment against a dead man is not void, but erroneous. Viner's Abridgement, Tit. Judgment, G. a.

And so, if after the commencement of a suit, a party plaintiff or defendant dies, before verdict or interlocutory judgment, it is an error of *fact*, which is corrected in the same Court by a writ of error, *coram nobis.* 2 Tidd's Practice, 1136.

But it is clear, from an examination of the case of the Union Bank and Parkhill's administrators, 1 Florida Rep., 110, *et seq.*, that the judgment of the Superior Court was reversed for errors of law in the record, and was not declared to be a void judgment.

I may here invite the attention of the Court to the case of Voorhees *vs.* Bank U. States, in which the Supreme Court of the United States go very far to support a judgment founded on constructive notice of the suit. 10 Peters, 471, 472.

And to the case of Ranahan *vs.* O'Neal, in which the Court of Appeals of Maryland fully sustain the position of the previous case cited. 6 Gill & Johns., 298.

32

Fraud, too, which strikes at the root of every contract and agreement does not affect judgments. Ch. J. Marshal, in delivering the opinion of the Supreme Court in Sims & Wise *vs.* Slocum, said, 'the judgments of a Court of competent jurisdiction, although obtained by fraud, have never been considered as absolutely void, and therefore all acts performed under them are valid so far as respects third persons.' 'All the legal consequences which follow a judgment are, with respect to third persons, precisely the same in one obtained by fraud as if it had been obtained fairly.' 3 Cranch Rep., 300.

Courts will not declare a judgment void, unless there is a total want of jurisdiction. The policy of the law requires that some sanctity should be given to judicial proceedings—some protection afforded to those who purchase at sales by judicial process, and some definite rules established by which property thus acquired may become transmissible with security to the possessors. 10 Peters, 473. 8 Missouri Rep., 257. 6 Gill & Johns. Rep., 298.

II. It is also argued by the counsel for the defendants in error, that the execution issued on the judgment is also void because it is irregular *on its face.*

The matter of irregularity, it is argued, need not be stated in the writ to make it irregular on its face, as if, according to the practice in England and in New York, where the execution is required to be tested of some day in term, if it be tested out of term it is irregular on its face; so if it issue against one who is dead, it is irregular on its face, although the death of the defendant be not stated in it, and cited. Woodcock *vs.* Bennett, 1 Cowen Rep., 734–'39.

On examination of the facts of this case, it will be found that it was a case of a judgment against two persons; one died—a year and a day elapsed after judgment before execution was sued out. It was then sued out without *scire facias.* The writ was held not void but voidable—it issued correctly against both defendants to correspond with the judgment, but could be levied only on the goods and chattels of the survivor: it was good against the survivor till set aside on his application.

At p. 738, there is a dictum of the Court that an execution against one who is dead is *void*, because the dead cannot appear in Court to move to set it aside for the irregularity: but the learned judge here referred to the case where the defendant was *ipso facto* dead, not to the case of a legal or constructive death. In the case at bar, the counsel for the defendants in error do not contend for

any other than a constructive death, and the reason does not apply ; the parties being alive could have appeared and moved to quash or set aside the execution, as effectually as they subsequently appeared in this Court to prosecute their writ of error to reverse the judgment.

The case of the administrators of Parkhill and the Union Bank, in 1 Florida Rep., 110, *et seq.*, was also referred to in connection with this point, but I do not understand this Court in that judgment to go farther than to decide that the judgment should be reversed for error. If, however, the counsel for defendants in error be correct in their position that Manly and wife were *civiliter mortui*, as administrators, from the time of the revocation of the letters of administration, and had " no day in Court," how could this Court recognize them as plaintiffs in error in their suit in error here for the reversal of the judgment of the Superior Court.

III. Having shewn that the judgment of the Superior Court in favor of the Union Bank of Florida against Parkhill's administrators was not void, though erroneous; then we contend that the other judgments and executions under which, as well as that of the Union Bank, the sale was made are not void ; the executions having been issued on the same day, and on judgments rendered at the same term of the Court, and on the same pleadings as the case of the Union Bank. See Record p. 19. These judgments are now irreversible from limitation of time. See the case of Voorhees vs. Bank United States, 10 Peters, 473, *et seq.*

IV. Again, it is urged by defendant in error, there is an irregularity in the *levy* of the writ of execution : the judgment is against Manly and wife as *administrators*—not administrators *de bonis non.* The command of the writ is to levy on the goods, &c., of S. Parkhill, in the hands of Manly and wife, administrators, and the Marshal has levied on the goods, &c., of S. Parkhill in the hands of Manly and wife, administrators *de bonis non,* and this is a patent irregularity.

We answer to .this, that they repesented the same right, they were the same persons claiming and having the same rights by another title. If one is sued as *executor* when he is *administrator,* and does not plead in abatement, he cannot set it up in bar of the plaintiff's action, because it is the same right and but by another name.—— Granwell vs. Sibley, 2 Levintz, 190. Harding vs. Salkin, Comberbach, 220. Same case, Skinner, 365. Powers vs. Cook, 1 Lord Raymond, 63–4.

So if judgment is rendered against one as *administrator* who is *executor* with another, and a second suit is brought against both in their character as executors, the former judgment against one of them as administrator may be pleaded in bar of the second suit, because there was a true debt due, and a recovery had upon the right of the debt. Parker *vs.* Amys, et al., 1 Levintz, 261.

The judgment being against a proper person by the wrong name does not vitiate it—the law looks to the right, and it is the same.— Therefore, a judgment and execution against A *executor* of B, when he is *administrator* of B, may be levied on the goods, &c., of B in the hands of A, administrator, to be administered, and thus it is shewn there is no irregularity, patent or otherwise.

The case of Griffith *vs.* Frazier, 3 Peters Cond. S. C. Rep., 1, was cited by the defendants' counsel to support their position : but it will be seen, on examination, to be wholly inapplicable. That was a case where an executor had proved the will of his testator, and had obtained letters testamentary thereon in the proper juris-diction in South Carolina, having removed from the State, the Ordi-nary afterwards granted administration *durante absentia* to another. A *scire facias* on a judgment recovered against the testator in his life time was sued out against the administrator *durante absentia,* and execution obtained, levied on the lands of the testator, and a sale thereunder. It was held by the Supreme Court that letters *durante absentia* could not legally issue after probate and grant of letters testamentary, and that therefore the administrator was not the rep-resentative of the deceased, but that *another person* was the repre-sentative who was the executor.

In the case at bar, the persons are the same who hold the right of representation ; they are called by the wrong title, but there is no question of their identity.

V. But the counsel for defendants in error assert there is another irregularity. The judgment and execution was against the goods, &c., of S. Parkhill, in the hands of Manly and wife, administrators, &c., and it was levied of the goods, &c., in the hands of Manly and wife and Moseley, administrators.

If an action at law be brought against one of two or more execu-tors or administrators, unless the non-joinder of the others be pleaded in abatement, the plaintiff will be entitled to his judgment against the one sued for debt, and if he proves assets in the hands of the de-fendant and his co-executors or co-administrators, he will be entitled

to his judgment that the debt be levied and made of those assets.— This cannot be denied.

This, then, is a sufficient answer to this alleged patent irregularity. The law will not give a plaintiff a judgment which cannot be enforced.

Again, if suit be brought against several co-executors or co-administrators, and upon the issue of *plene administravit*, assets be found in the hands of one only, the plaintiff can take judgment only against him whom he proves to have assets; if then, it would be irregular to levy on those assets in the hands of another of the executors, or in the joint possession of two or more it would always be in the power of several co-executors or administrators to defeat the action of judgment creditors by shifting the assets from one to another, as the circumstances of their case might require.

The slaves so levied on by the Marshal were in possession of Manly and wife as well as Moseley, and were of the goods of Samuel Parkhill, deceased, the debtor of the plaintiff. This possession is asserted in the declaration filed in the present suit by the defendants in error, and cannot be avoided or denied.

I have thus, I think, met and answered satisfactorily all the positions of the counsel for the defendants in error, so far as the validity of the judgments and subsequent proceedings thereon are concerned, singly and in the order presented and urged upon the Court; if I am not mistaken in the conclusions I have arrived at, that not one alone is tenable, it certainly follows that they derive no additional force taken together.

If, then, the judgments of the Superior Court were erroneous, and not void, and the execution, the process prescribed by law, it follows that the authorities referred to by my colleague, Mr. Hagner, that the judgment and execution are good and valid until reversed, and that all proceedings had thereon are good—that is, the officer is protected in executing the writ, and the purchaser is protected in the possession and enjoyment of the property acquired at the sale under said process. Upon reversal of an erroneous judgment, which has been executed, the defendant is entitled to restitution of the money only.

*Question of Estoppel.*—I come now to this question, in which we say, that even if we are mistaken in our view of the validity of our title under the judgments and executions, yet these parties are *estopped* by their acts, declarations and conduct from setting up a title adversary to us.

For a full view of the law upon this point, I need only refer to the very able argument of my colleague, Mr. Hagner, a brief of which is in the possession of the Court. With this general reference to the authorities it will be sufficient for me here to assert, that from the decision of Lord Denman in Pickard *vs.* Sears, 33 Eng. Com. Law R. 115, 117, of the same Judge, in Gregg *vs.* Wells, in 37 Eng. Com. Law R., 54, and the Supreme Court of New York in Dezell *vs.* Odell, 3 Hill's Rep., 217, as well as the other authorities, it seems clear that the law of *estoppel in pais* may be laid down thus:

1. Words or conduct causing another to believe the existence of a certain state of things.

2. In which the person speaking or acting did so wilfully, culpably or negligently.

3. By which such other person may be induced to act so as to change his own previous position.

Under the first head, let us refer to the evidence in the record to ascertain what were the words, and what the conduct of Moseley in reference to the subject matter of dispute.

1. He sent a slave to Ponder to tell him to purchase her assigning his own inability as a reason for not making the purchase himself.

2. At the sale he encouraged Ponder to buy, saying there would be no difficulty about the property, thus giving confirmation as to the verity of general impressions, and removing all trace of doubt in relation thereto.

3. His active participation in the sale by the Marshal, arranging the slaves into lots and parcels—insisting on the division of families in order to secure a better price, recommending the slaves and speaking of their good qualities.

4. Encouraging others to bid; and,

5. Offering the highest evidence of the sincerity of his acts and declarations, and his belief therein, by bidding for himself and his friend and counsel, W. H. Brockenbrough, Esq.

These are among the most prominent of his acts and conduct, and who is there who can say that these acts and declarations, &c., did not induce the belief in all who saw and heard, that, by the sale, a full, complete, and valid title would pass, free from all objection on the part of Moseley? Could any one suppose that Moseley did not believe in such a state of things?—and was it possible for a person there attending and purchasing to believe, or even to think

that from Moseley he must expect a harassing and vexatious litigation, for the very property which he (Moseley) was urging them to buy? Clearly not. Moseley, therefore, did, by his acts and conduct, induce a " belief of the existence of a certain state of things," which the law of "good words" will now interfere and estop him to deny.

Under the second head, we ask, was not this conduct wilful, culpable or negligent, for either is sufficient? To answer this, it is sufficient to look at the testimony, and see if he did not then know as much in relation to the property as he did afterwards, and now.

Can it be pretended he did not then know that he was one of the administrators *de bonis non* of S. Parkhill—that the property was taken from the possession of Mr. Manly and wife and himself, by the Marshal, on an execution in favor of the Union Bank of Florida, against Mr. and Mrs. Manly, as administrators of said estate, as well as other executions, in favor of other plaintiffs?—and did he not know the proceeds of the sale would be applied to the satisfaction of the executions? Did he not know the state of pleadings under which said judgments were obtained? What does he now allege?—that the judgment execution, levy and sale, are void, and no right or title passed thereby to the purchaser. Are his acts, conduct, or declaration at the sale, consistent with the claims now set up?

Knowing all the facts and circumstances, and his present claims of right and title, he was bound to declare them to those strangers whom he saw about to purchase. *Silence* under such a state of things would be inexcusable—*a multo fortiori*—the active participation in the sale, and his encouragement to the persons present to bid for and purchase the property. His encouragement of, and advice to Ponder, to purchase, was personal and direct—and can it be said his acts, &c., were not wilful and culpable?

*Lastly.* Can it be denied that Ponder's position is changed?— has he not parted with his money?

Is it possible to assert, upon the evidence in this record, that Ponder parted with his money on any other ground than for the purchase of property, to which his title would be good? We say, without the fear of contradiction, that if the title he bought proves defective, he looses his money, the consideration paid for it—has no claim for indemnity upon the officer, none upon the plaintiff in execution

—he is utterly remediless, unless he is protected in the possession and enjoyment of the property.

Here, then, is a concurrence of every circumstance necessary to constitute an estoppel. The Court will not go beyond the record to ascertain what were the moving causes of Ponder's action, when sufficient reasons appear in the proofs. It is said Ponder came to the sale with his own opinion as to the existing state of things.— No evidence of it. Ponder states there was a general opinion, but he does not say he participated in it. He does not seem to have acted on it, or the opinion of counsel; but he asks Moseley for information, and he confirms the general opinion, and advises him to purchase. There seems to have been a doubt upon Ponder's mind— a doubt sufficient to put him on inquiry, and he applies to Moseley, as a representative of Parkhill's estate, as one in authority, and likely to know what was the truth; and it is evident, from Ponder's action, that Moseley's declaration and advice influenced him, and it is from Moseley now that he finds his title assailed. The conduct of Ponder was that of a careful and cautious man, anxious to avoid litigation. Moseley advised the purchase—did all the acts specified in the evidence; and Manly was present during the whole period of the sale, and by his silence, tacitly acquiesced in all that *his co-administrator said and did.*

On the part, however, of the defendants in error it is alleged that the purchasers should not only have given Moseley and Manly notice that they purchased on the faith of their acts and declarations, but should have demanded their guaranty and bill of sale.

With due reference to my learned brethren, it is clear that to maintain such a principle is to deny, *in toto,* the doctrine of estoppels *in pais;* for if Moseley and Manly had given their bill of sale, then they would be estopped *by deed,* which is another kind of estoppel.

They contend that the two titles which are set up are inconsistent, to wit: 1. Camp's bill of sale; and 2, the estoppel of plaintiffs.

Now this argument would apply to every conceivable case, and would forever prevent the application of an estoppel *in pais.* If I buy a slave from B, and A who is the real owner, stands by, hears the bargain, sees the consummation, and says nothing, is it not true that I buy B's title, and get A's by his silence? And when I rely on A's title, do I repudiate that which I have from B?

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

Lord Denman, in the case of Pickard *vs.* Sears, before cited, says that in such a case the real owner may "part with his interest in the property by verbal gift or sale, without any of those formalities that throw obstacles in the way of legal evidence."

Again it is urged that to constitute an estoppel it must not only appear that the party sought to be estopped made the admission, but the other party acted on it alone.

If this is true, would not the party engaged in a treaty for the purchase from A when B is present, and assures the purchaser of A's title, in every case afford evidence against himself, that he acted upon the faith that he was buying A's title and not B's from the fact that he took A's title, and did not ask for B's? If the *quo animo* of the purchaser was the thing to determine when a party shall be estopped by his admissions, and to be thus tested, then there could be no such thing as an estoppel, because the circumstances would always be against the purchaser, that he relied on the title from whom he purchases :—if he did not, it might be asked why not abandon the treaty with that man, and buy the other's title.

The true question therefore is: Did the party make an admission or statement of the existing state of things upon which the other party might have acted—and it is not submitted to the jury to weigh possibilities as to whether he did act on that admission, or whether he relied wholly on the title of the vendor—or whether he would have completed the purchase without the admission?

It is also urged that to constitute the estoppel, the party sought to be charged by it must not be himself deceived, but must know his own rights.

To support this, Moore & Hitchcock, 4 Wendell, 292, is cited; but on examination it will be found that the case cited presented not one of the features of an estoppel; it was a question whether a party could explain an ordinary admission made in an attempt to settle and adjust a controversy. It was made after the transaction had occurred—no action was had or could have been had on it prejudicial to the other party, whose position was not in fact altered.

But the case of Coles *vs.* The Bank of England, in 37 Eng. Com. Law Rep., 134, is one where the party estopped the plaintiff's testatrix, was herself deceived, most grossly deceived, yet the plea was not recognized as sufficient.

So, also, in Hamer, et al., *vs.* Johnson, et al., 1 Smedes & Marshal

Ch. Rep., 563, the party was estopped by his admissions that the notes in that case were good, valid and binding notes—the Court holding he was bound to make them so ; and the plea which he set up that he was himself deceived, was not allowed to have any force. See also 1 Story's Equity, 202–3.

It is also argued that loose expressions will not amount to an estoppel, and the following cases are cited : Jordan vs. Antrey, 10 Ala. Rep., 278. Tuffts & Hays, 5 N. Hamp., 452. Jackson vs. Anderson, 5 Wend., 480.

While we freely admit that loose and general expressions not made to the party, and not calculated to induce him to believe in a state of things, so as to produce a change of his previous position, will not amount to an estoppel, yet we contend such is not the case at bar. The authorities cited shew that loose and general expressions upon which the party could not have acted do not amount to estoppels, and are not applicable.

It is also urged by the counsel for the defendant in error that one of several cannot estop those interested with him, unless there is a joint interest : that a community of interest is insufficient—and cites Greenleaf on Ev., 209—211.

We admit the position but deny its application here : if these parties were tenants in common, then the act of one would not bind the others, because they hold by unity of possession, not of property ; but co-executors and co-administrators have a joint interest, and the act of one in selling or disposing of the estate in their hands, &c., is the act of all—the property passes, for they have a joint and entire interest. See this subject fully discussed in 1 Williams on Executors, p. 591, of the Phil. edition of 1832. Bacon's Abr. tit. Executors, (D) 1.

It is said that the admission of one co-executor will not take a case out of the statute of limitations ; this is not stated broad enough— the admission of all cannot have that effect. Thomp. vs. Peter, 12 Wheaton Rep., 565.

The true doctrine is that one of several co-executors or administrators or trustees cannot by his admission charge the others personally as for a devastavit : and it is this which is intended, when it is said one trustee, executor, &c., cannot bind his colleagues. See Nation vs. Tozer, 1 Crompton, Meson & R., 172.

The case of Fox vs. Walter, cited from 4 Perry and D. 9, has no application, for it is manifest from the evidence that Moseley did act

*qua* administrator: he was not, in the eloquent description of the learned counsel, a discredited representative, impotent to act. His suggestions and directions as to the sale of the property so as to produce the most money were implicitly obeyed, even against the dictates of feeling and common humanity in the separation of families. This shews that he assumed to act as one having a deep interest: no stranger would have so acted, or been permitted to make requisitions upon the officer so repugnant to feeling: they were yielded to, no doubt, because they were supposed to be prompted by a stern sense of duty.

In Cross *vs.* Terlington, 2 Murphy Rep., 8, one was held bound as administrator by his acts before his appointment.

Another objection is urged against the estoppel, because it is said Moseley as administrator had not power to dispose of the estate of his intestate by any other means than a public sale; nor could he sell the slaves till all the other estate was disposed of, and only to pay debts; and cited Thompson's Digest, 202.

The answer to this is, that the statute is *directory* merely—it points out how the executor, &c., may perform his duty—it contains no negative words—it does not declare the sale made otherwise to be null and void. It does not conflict with the common law, as to the power of executors or administrators, but points out his duty.— If he departs from the instructions given, his acts are not invalid; but if injury results, he is liable as for a *devastavit.*

The case of Ventris *vs.* Smith, in 10 Peters, R., 173, cited by the counsel for defendants in error, was decided on the local law of Alabama, which differs from our statute, and from the common law.— In Alabama, the slaves may not be sold without an order of Court —the statute is negative and peremptory, and if not followed, no title passes.

The excuse set up for Moseley, that he yielded to superior force alone, is not sustained by the record—he did not speak or act like one coerced into measures. It is said he had exhausted all his lawful remedies, and nothing was left him but to oppose by force of arms, which he would not attempt.

An error—his legal remedy was not exhausted, if it is true that he was a stranger to the proceedings, he could have interposed his claim under the statute, by tendering his affidavit and bond. The injunction applied for may have been refused on the ground that if he had any remedy, it was complete at law upon his own showing.

The only point remaining to be disposed of is, that the property in question had been mortgaged by the intestate Samuel Parkhill in his life time, and, therefore, was not liable to seizure and sale, under an execution at law.

It will be seen from the record that the slaves were mortgaged to the Union Bank, the plaintiff in one of the executions under which they were sold, to secure the subscriptions of Samuel Parkhill to the capital stock of said Bank; and that the obligation on which the judgment and execution of the Bank was for a loan made under the 29th section of the charter of the Bank, on a pledge of the stock.

The Court of Appeals of the Florida Territory decided in the case of Kissam *et al., vs.* Chapman *et al.,* that the Bank had a lien on the property mortgaged for the loan, on the pledge of stock, under the 29th section of the charter, as well as for the subscriptions to the capital by the stockholder, which gives the right to the Bank to pursue the property for this very debt.

Whether the Bank does or does not perform its duty to the Territory, in the application of the funds to the extinguishment of the Territorial bonds, is not for these parties to inquire of. If the Bank does not faithfully perform its trust, it is for the Territory, or the holder of the Territorial bonds, to complain. The Bank, as mortgagee, is the legal owner; and these parties—that is, the representatives of Parkhill's estate—cannot deny the right or title of a purchaser of property, under an execution in which they are defendants.

If the Bank has taken its own property, or the property of a third party, a stranger, to pay a debt of their intestate, it does not lie in the mouths of these mortgagors to complain of it.

LANCASTER, J., delivered the following opinion :

This case comes before this Court by appeal from Leon Circuit Court. It is an action of detinue brought by the administrators *de bonis non* on the estate of Samuel Parkhill, deceased, to recover from the defendant, William G. Ponder, certain negro slaves alleged to belong to the plaintiffs as such administrators, and to be detained by the defendant, Ponder. The declaration contains two counts. The first declares upon a delivery of the slaves to the defendant by the plaintiffs, to be re-delivered to them, when he, the defendant,

should be thereto requested. The second count declares, upon a casual loss of the slaves by the plaintiffs, and that said slaves afterwards came to the possession of the defendant, Ponder, by finding; and that he, well knowing the said slaves to be the property of the plaintiffs as administrators, &c., aforesaid, although often requested so to do, hath not delivered them to said plaintiffs, as administrators, &c., as aforesaid, and still detains the same.

To this declaration, the defendant pleaded—1st. *Non detinet.* 2d. That said slaves sued for, or any of them, were not the property of the plaintiffs, as in their declaration alleged. 3d. That the plaintiffs were not lawfully possessed of the negro slaves mentioned in the second count in their declaration. Upon all of which pleas, issues were joined. Upon the trial of this cause, the plaintiffs among other things offered in evidence the revocation of letters of administration to Martha Ann Manly, late Martha Ann Parkhill, on the estate of Samuel Parkhill, deceased; to the introduction whereof the defendant by his counsel objected—which objection was overruled by the Court, the testimony admitted, and thereupon the defendant by his counsel excepted. The plaintiffs also offered in evidence sundry mortgages executed by Samuel Parkhill in his life time to the Union Bank of Florida, (nine in number,) to secure his shares of stock in said bank, with a view of proving that the slaves in suit were embraced in said mortgages, &c., &c. To the introduction of which evidence the defendant by his counsel objected, but the Court overruled the objection, and allowed the testimony to be given in evidence before the jury—to which ruling the defendant by his counsel excepted; also, a bill in Chancery of W. D. Moseley, one of the plaintiffs in this suit, praying an injunction, &c., to restrain the sale of the negroes belonging to the estate of S. Parkhill, deceased—which injunction was denied by the Judge of the Superior Court, to whom it was presented to be allowed. To the admission of which in evidence the defendant by his counsel objected, but the Court overruled the objection, and allowed said bill to be read in evidence to the jury—to which decision of the Court, the defendant by his counsel excepted. The proof on both sides having been given in evidence, and the cause fully argued by counsel on behalf of each of the parties, the Court gave to the jury eight several instructions. And the counsel for defendant moved the Court to give sundry instructions, numbered from one to fourteen, inclusive—all of which were refused by the Court to be

given, but instead of the tenth instruction asked by the defendant, gave an additional instruction—all of which said instructions given or refused by the Court are specifically set forth in the record. To all which said several rulings, decisions, and judgments of the Court, on the trial of this cause, and to the instructions given and the instructions refused to be given to the jury, the defendant excepted, and prayed his exceptions might be signed, sealed, and enrolled, and made part of the record of this case, which was done.

The plaintiffs proved that their intestate, S. Parkhill, deceased, died seized and possessed of the slaves for which this suit was brought, which continued to be the property of his estate, up to the time of the seizure by the Marshal of the Middle District of Florida, of which mention will be hereafter made. It further appeared in evidence, introduced by the plaintiffs, that, on the 20th of March, 1845, the said Marshal levied on the slaves in this suit depending, as well as other slaves belonging to the estate of S. Parkhill, deceased, by virtue of an execution, or writ of *fieri facias*, issued from the Clerk's Office of the Leon Superior Court, wherein the Union Bank of Florida was plaintiff, and Martha Ann Manly, late Parkhill, and Hiram Manly, in right of his wife said Martha Ann, administrators of Samuel Parkhill, deceased, were defendants; which said execution was issued by virtue of a judgment rendered in the Superior Court for Leon county aforesaid, wherein the said Union Bank of Florida was plaintiff, and the said administrators were defendants, and which judgment was in favor of the plaintiff. It further appeared, that by virtue of said levy by the Marshal under the execution aforesaid, and after having duly advertised the same, the said Marshal, on the 1st Monday in May, 1845, proceeded to sell the said slaves in this suit depending at public sale, to the highest bidder for ready money—at which said sale the said defendant, William G. Ponder, became the highest bidder, and bought and paid for the said negroes. Upon which title, supported by an alleged estoppel *in pais*, the defendant placed his defence.

The plaintiffs contend that the aforesaid judgment of the Superior Court, rendered in favor of the Union Bank of Florida against the said Martha Ann Manly late Parkhill, and Hiram Manly in right of his wife said Martha Ann, administrators of Samuel Parkhill deceased, as well also as the execution or writ of *fieri facias* issued thereon, and upon which execution or writ of *fieri facias*, the levy and sale of the negroes was had, which said negroes are the subjects of con-

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

troversy in this suit, were and are null and void.   And further that there are or were no acts or things done by the said plaintiffs which can or ought to amount to an *estoppel in pais*, so as to conclude them from having and maintaining this suit.

Upon these positions of the parties, the first instruction given by the Court, is in the following words, to wit :

1. The judgment and execution under which the slaves were sold are wholly void, and gave no authority, and no right of property passed by the sale.

This instruction was excepted to by the defendant and it now devolves on this Court to decide upon its propriety.

Whether a judgment be absolutely or wholly void depends upon the jurisdiction of the Court in which it is rendered ; this again is divided into jurisdiction of the subject matter of the suit, and of the person of the defendant.

The suit in which the judgment referred to was obtained, was instituted in the Superior Court of the Middle District of the Territory of Florida, held in and for the county of Leon in said Territory, upon a bond executed by Samuel Parkhill in his life time, to or in favor of the Union Bank of Florida.   The Superior Court was organized and jurisdiction conferred upon it by virtue of sundry acts of Congress.     The act approved May 15, 1826, entitled "An Act to amend the several acts for the establishment of Territorial Government in Florida," contains in the first section thereof the following provisions : " That the Superior Courts of the Territory of Florida within their respective districts shall have and exercise original jurisdiction in all civil cases in law or in equity, whether arising under the laws of the said Territory, or otherwise, where the sum in controversy shall amount to one hundred dollars, and shall have original and exclusive cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation, or trade of the United States, whether such seizures be made on land or water, and all suits for penalties or forfeitures incurred under the laws of the United States, and original but not exclusive jurisdiction of all suits in which the United States shall be a party, whatever may be the amount in controversy in such causes and suits, and shall have and exercise appellate jurisdiction in all civil causes originating in the Inferior Courts of said Territory, whatever may be the amount in controversy ; and shall have and exercise original and exclusive jurisdiction of all crimes

and offences committed against the laws of said Territory, where the punishment shall be death ; and original and appellate jurisdiction of all other crimes and offences committed against the laws of the said Territory ; and original and exclusive jurisdiction of all crimes and offences which shall be cognizable under the authority of the United States, committed within the respective districts of the said Superior Courts, or upon the high seas."

The second section of the same act gave power to the Superior Courts in term, and the judges thereof in vacation, to issue writs of *habeas corpus*, of error, of *certiorari*, of *mandamus*, of prohibition, of *scire facias*, and of *quo warranto*, according to the principles and rules of law.  See Thompson's Dig., 597.

It may, perhaps, be safely assumed, that no Court in the United States, or in any State of the Union, either now or in time past, is or was invested by law with a more general original jurisdiction than was by the act of Congress in the sections before recited and referred to, given to that Court.    It was emphatically a Court of general jurisdiction, and by the first clause of the first section recited above, had jurisdiction of the subject-matter of the suit between the Union Bank of Florida, and the administrators of Samuel Parkhill, deceased.

But to perfect the jurisdiction of a Court of general jurisdiction, it is necessary to have jurisdiction of the person of the defendant in the action.    That is to say, he must have actual or constructive notice of the institution of the suit by which an opportunity is or may be afforded him of making defence, if he should desire so to do.    In the case of the Union Bank of Florida against Parkhill's administrators, the suit was commenced by summons *ad respondendum*, against said administrators, the mode directed by the laws of Florida for instituting suits in the Courts of the Territory.  · See Duval's Compilation, p. 90, Sec. 4. The process was regularly returned by the Marshal duly executed, and the defendants, the said administrators of the said Samuel Parkhill, deceased, appeared in Court, and pleaded to the action, the pleas of *non est factum* and *plene administravit.*    These pleas were pleas in bar.    It is laid down in Bacon's Abridgement, Title Pleas and Pleading, letter (A,)  " that the order of pleading is,  1.  To the jurisdiction of the Court.    2.  To the person of the plaintiff, and next of the defendant.    3.  To the count or declaration.    4.  To the writ.    5., To the action of the writ.    6.  To the

action itself in bar thereof." The author then adds "this has been settled as the most natural order of pleading, because by this order each subsequent plea admits the former; as where the defendant pleads to the person of the plaintiff he admits the jurisdiction of the Court, for it would be nugatory to plead anything in that Court that has no jurisdiction in the case." When therefore he pleads in bar of the action he admits the action of the writ—the writ—the count—the parties—and the jurisdiction of the Court.—The pleas in that action were pleas in bar of the action, and therefore according to the order of pleading before mentioned (which order is substantially recognized by all the legal writers who have treated on the subject of pleading at common law) all the antecedent steps were admitted by the defendants to have been legally or aptly taken. But the defendants having appeared in Court and pleaded to the action thereby admitted legal notice of the institution of the suit as well also as the jurisdiction of the Court, not only of the parties to the action, but also of the subject matter of the suit. On the two pleas in bar before mentioned issues were joined by the plaintiff. At that time the jurisdiction of the Court in that cause, not only existed in contemplation of law, but by the steps taken, had acquired a practical application to the parties to the action. Subsequently the defendants pleaded *puis darrien continuance*, a revocation of their letters of administration on the estate of Samuel Parkhill, deceased, to which plea the plaintiff demurred. Demurrer was sustained. Defendants then amended their plea *puis darrien continuance*, and plaintiff filed a replication. The defendants rejoined, and plaintiff demurred, which demurrer was sustained and judgment as aforesaid given for the plaintiff. Upon which judgment execution as aforesaid issued, went into the hands of the Marshal, was levied and negroes sold in the manner herein before stated. After the sale a writ of error was sued out, by the defendants against the plaintiff returnable to the Supreme Court of the State of Florida, upon the hearing whereof it was decided by the said Court that "errors were well assigned" and "the judgment was reversed." See Parkhill's Administrators *vs.* Union Bank of Florida. 1 Flo. R., 110 to 133.

The defendant in this case (the appellant in this Court,) claims title to the negroes in controversy, under and by virtue of a purchase made by him at a public sale of the Marshal of the Middle District of Florida, who levied, advertised regularly, and so sold,

34

under and by virtue of an execution issued from the Clerk's office of the Superior Court in and for Leon County, upon a judgment rendered by said Superior Court, at a time when said judgment was unreversed and in full force.   But which judgment was afterwards reversed by the Supreme Court of the State of Florida, not because the Superior Court had not jurisdiction in the case, both of the subject-matter and of the parties, but because of errors apparent in the proceedings in the Court below.   Many instances were cited in argument, which showed the Courts had considered and declared judgments void for want of jurisdiction of the person of the defendant.   As where the defendant had never been summoned actually or constructively.   Campbell, et al., *vs.* Brown, 6 How. Miss. R., 111.   No service of process personally or by publication.   Denning *vs.* Corwin, 11 Wend. Rep., 651.   An attempt at service by publication against "unknown heirs,"—not evidence of the existence of *heirs,* and decree and deed in pursuance thereof, could not pass title without such evidence.   Hollingsworth *vs.* Barbour, 4 Peter's Rep., 472.

So also in cases where Courts of special or limited jurisdiction, have exceeded their powers, by attempting to assume where they have not jurisdiction over the person.   Thus a Court Martial assumes jurisdiction where the party was not liable to Martial law, held void.   Smith *vs.* Shaw, 12 John. R., 257.

In a case of assessment of taxes, if the person taxed or the subject-matter of taxation, be not within the authority of the officers who make the assessment, all subsequent proceedings by mere ministerial officers, under a warrant to enforce the tax are deemed utterly void, the original assessment being *coram non judice.*   Thurston *vs.* Martin, 5 Mason R., 501.   See also cases there cited.

Upon a commission of bankruptcy sued out against a person not a *trader,* (a class of persons over whom, under certain circumstances commissions may issue) it was held the commission of bankruptcy was void, the jurisdiction being confined to particular persons and cases.   And the Court said, "Where Courts of justice assume a jurisdiction which they have not, an action of trespass lies against the officer who executes process, because the whole proceeding was *coram non judice.*"   2 Wilson R., 384.   An application was made for letters of administration during the absence of the executor who had duly proved the will of the testator, and qualified as executor thereto, which was granted by the Court of Ordinary in the State of South Carolina.   This case going by writ of error to the Su-

preme Court of the U. S., the Court say, (Chief Justice Marshal delivering the opinion) "In its very nature, the appointment of an administrator, during the absence of an executor under no disability is essentially nothing more than the appointment of an agent for that executor. This the ordinary has no power to do. The executor alone can appoint his agents. If the ordinary had *no jurisdiction* in the case, then the grant of administration was void *ab initio*, and all the acts of the grantee are void." Griffith *vs.* Frazier, 3 Peter's Con. R. S. C., 11–12.

These cases and many others not deemed necessary to be referred to, shew that to authorize the assertion, that a judgment is void, it must have emanated from a Court of limited jurisdiction, not acting within its legitimate prerogative, or in a Court of general jurisdiction where the parties are not actually, or by legal construction before the Court and subject to its jurisdiction.

The case referred to in the instruction under consideration was before a Court of general jurisdiction. The parties were before the Court. Pleas in bar of the action and *puis darrien continuance* were filed. Upon the whole case judgment was given by the Court for the plaintiff which was subsequently reversed for error. Was this judgment void or voidable?

It is laid down in Elliot, *et al.*, *vs.* Piersol, *et al.*, 1 Peter's R., 340, and re-asserted in 2 Peters 169, "where a Court has juris liction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment until reversed is regarded as binding in every other Court."

So in the case of Voorhees *vs.* the Bank of the United States, 10 Peters 474–5, the Court say: "the line which separates error in judgment from the usurpation of power, is very definite, and is precisely that which denotes the cases where a judgment or decree is reversable only by an Appellate Court or may be declared a nullity collaterally, when it is offered in evidence in an action concerning the matter adjudicated or purporting to have been so. In the one case it is a record importing absolute verity; in the other mere waste paper."

The foregoing authorities as well as many others not supposed necessary to be referred to, clearly show that judgments of Courts of general or competent jurisdiction, are not considered under any circumstances as mere nullities, but as records importing absolute verity and of binding efficacy, until reversed by a competent appel-

late tribunal. They are voidable: not void. The Supreme Court of Florida decided in the case of Parkhill's Administrators *vs.* the Union Bank of Florida, the judgment of the Court below was erroneous. It did not decide it was void.

While then the judgment of the Superior Court which has already been shewn to have been a Court of general and complete juris-diction remained of record, and unreversed, importing *per se* abso-lute verity, and possessing by virtue of the authority of the Court in which it was rendered, a binding efficacy, an execution issued thereon, and was placed in the hands of the proper officer of the Court, who levied the same on the negroes in controversy in this suit, being the property of the estate of Samuel Parkhill, deceased, against whose representatives that judgment was rendered and af-ter having duly advertised the sale thereof proceeded on the designated day to offer said negroes for sale at public outcry to the highest bid-der. At which sale the defendant in this action below, Wm. G. Ponder, being the highest bidder became the purchaser and paid for and obtained the delivery to him of the said negroes. This then being a case of a purchase under an execution issued in conformi-ty to the statute in such case provided, under a judgment rendered by a Court of competent jurisdiction, and when execution issued of binding efficacy, it is sufficient to give the purchaser a good title. Armstrong *vs.* Jackson, 1 Blackford, 210.

The judgment of the Court, the execution and the bill of sale of the Marshal, were all in evidence in this case, and this was all the defendant was required to shew. Lessee of Cooper *vs.* Galbraith, 3 Wash. C. C. R., 550, and cases there cited. Also Simms and Wise *vs.* Slacum, 3 Cranch, 300. In which last case C. J. Mar-shal says, " the judgments of a Court of competent jurisdiction (al-though obtained by fraud) have never been considered as absolutely void, and therefore all acts performed under them are *valid* so far as respects *third persons.*"

The plaintiff in this action in the . Court below proved that there were nine other executions issued from the same Clerk's office, on judgments rendered by the same Superior Court, at the same term, and on the same state of pleadings as in the case of the Union Bank of Florida against Manly and wife Administrators of S. Parkhill, in favor of other plaintiffs which judgments have never been ap-pealed from, or in any wise reversed, and which are now irreversi-ble because by limitation no appeal or writ of error can be now ob-

tained,—and under which other executions a levy and sale of the negroes in this controversy, were also had and made at the same time and place. In the case of Voorhees *vs.* the Bank of the United States, 10 Peter's R., 475, the Court state the doctrine and say "there can be no middle character assigned to judicial proceedings, which are irreversible for error. Such is their effect between the parties to the suit, and such are the immunities which the law affords to a plaintiff who has obtained an erroneous judgment or execution. It would be a well merited reproach to our jurisprudence if an innocent purchaser no party to the suit, who had paid his money on the faith of an order of Court, should not have the same protection under an erroneous proceeding as the party who derived the benefit accruing from it. A purchaser under judicial process, pays the plaintiff his demand on the property sold; to the extent of the purchase money he discharges the defendant from his adjudged obligation. Time has given an inviolable sancity to every act of the Court preceding the sale, which precludes the defendant from controverting the absolute right of the plaintiff to the full benefit of his judgment, and it shall not be permitted, that the purchaser shall be answerable for defects in the record, from the consequence of which the plaintiff is absolved. Such flagrant injustice is imputable neither to the common or statute law of the land. If a judgment is reversed for error, it is a settled principle of the common law coeval with its existence, that the defendant shall have restitution only of the money. The purchaser shall hold the property sold, and there are few, if any states in the Union who have not consecrated this principle by statute."

It was urged in argument in this case, that the writs of execution were illegally levied. The judgments being against Manly and wife, administrators, and not against them and Moseley, administrators *de bonis non* of S. Parkhill, deceased.

The executions were commanded to be levied of the goods, &c., of Samuel Parkhill, deceased, in the hands of Manly and wife, administrators, &c. That the goods were the goods of S. Parkhill, deceased, and in their hands, is averred in both counts of the declaration : it is true they allege them to have been the goods, &c., of S. Parkhill, deceased, and to have been possessed by them, together with William D. Moseley, the other plaintiff in this suit, as administrators *de bonis non.* Now the judgment was against them as administrators, and the execution went against them as such, to be

levied of the goods, &c., of their intestate, by reason of his indebtedness; the execution was levied on his property, and went to pay his debt, and *pro tanto* to relieve his legal representatives. If one is sued as executor, when he is administrator, it must be pleaded in abatement—he cannot set it up in bar, because it is the same right, and but by another name. Granwell *vs.* Sibley, 2 Lev., 190. Harding *vs.* Salkin, Comb., 220. Powers *vs.* Cook, 1 Lord Raymond, 634.

If debt is brought against two as executors, they plead judgment against one of them as administrator. This is good in bar, because there was a true debt due, and a recovery upon the right of the debt. Parker *vs.* Amys, 1 Lev., 261. So the administrators *de bonis non* in this case might plead a former recovery against some of them as administrators, and a payment by one as administrator would be good in bar to prevent a recovery against the whole as administrators *de bonis non.*

The Court are aware there is a conflict of authorities on this point. In the recent case of Taylor and others, *vs.* Savage, 1 How. S. C. R., 282, the Court say, (Chief Justice Taney delivering the opinion,) " The decree in the Circuit Court is against George M. Savage, executor of the last will and testament of Samuel Savage, deceased. There was no other party respondent in the District Court, and the decree was passed against him in his representative character. Before the appeal was prayed on either side he had ceased to be the representative of the estate of Samuel Savage, and had no control over it, nor any right to interfere with it, by prosecuting or appearing to an appeal, or in any other manner. By his removal from the office of executor, he was as completely separated from the business of the estate as if he had been dead, and had no right to appeal in or be a party in this or any other Court, to a suit which the law confided to the representative of the deceased. No further proceedings, therefore, could be had in the District Court until Benham, the administrator *de bonis non,* was made a party." It further appeared in this case by affidavit, that after appeal granted, and the record was made out and sent up, (for no notice was taken of it on the record,) execution had issued in favor of the appellant. The Court say, "In this view of the subject, it follows that the execution issued on the decree was unauthorized and void, and no right of property will pass by a sale under it, if one should be made by the Marshal."

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

In the case of Jewitt *vs.* Jewitt, 5 Mass. R., 275, Chief Justice Parsons says, "that it is a good plea in bar against an administrator, that since the commencement of the action against him, he has been removed from office by the Judge of Probates." "If the matter of the plea be good, it shows that the plaintiff has no cause of action against the defendant, either on this or any other writ. It is, therefore, properly pleadable in bar."

I have not been able to perceive the precise analogy of the last case cited to the present one, although by the revocation of letters of administration to Mrs. Manly and her husband on the estate of S. Parkhill deceased, if letters of administration *de bonis non,* on the estate of the decedent had been granted to any other person, the plea would be good in bar because no action could be maintained against them as administrators on that, or any other writ, yet when the same identical persons are appointed administrators *de bonis non,* to succeed themselves as administrators on the same identical estate, and on which the same plaintiff claims to have a cause of action, it seems to me that although the writ on which the suit was progressing might not be properly allowable, yet another writ might be given against the defendants on which suit could be maintained, to wit: a writ against Martha Ann Manly, late Parkhill, and Hiram Manly in right of his wife, and William D. Moseley, administrators *de bonis non* of Samuel Parkhill, deceased, the two former being the same identical persons, and not different, defending by representation the same identical estate. Whereas, if as administrators they pleaded a good plea in bar, when they came to be sued as administrators *de bonis non,* jointly with Moseley, for as much as the plaintiff's action would be barred as to them, it would be barred against the administrator *de bonis non,* because being joint, they are as one person in law for the purpose of representing the estate, and this would be, to make the revocation of letters of administration to Mrs. Manly and her husband, a good plea in bar to the plaintiff's action. I cannot think the plaintiff should lose his right of action, or his demand (if one be due him) for such a cause.

In the case of Taylor, et al., *vs.* Savage, Chief Justice Taney in delivering the determinations of the Supreme Court announced the execution in that case void and very properly as a consequence said no right of property will pass by a sale under it. The recognized doctrine everywhere is, that a sale under a *void* execution will not pass property to the purchaser. The reason on which the Chief

Justice founded his determination is that in that case there was no defendant in Court, the executor having ceased to be the *representative* of the estate of Samuel Savage, and administration having been committed to a different person. That the executor had no right to interfere with the estate by prosecuting, or appearing to an appeal, or in any other manner. If the administration *de bonis non*, had been committed to the same person the case would have been distinctly different, and the execution would not have been void, but at most but voidable. In this case we have seen the defendants Manly and wife not only in Court pleading after the revocation of their letters, and subsequent re-appointment to the same trust as administrators *de bonis non*, but they pray a writ of error—it is allowed them. They appear in the Superior Court, are recognized as competent parties, maintain their writ of error, and the judgment below is reversed upon their motion.

They must therefore have been competent parties whom an execution might issue, upon a judgment unreversed and unappealed from, and which itself was not void but erroneous. The execution in this case was therefore only voidable, and under such an one a purchaser acquires a right of property, and is distinguishable from the case of Taylor, et al., *vs.* Savage. But in the case under consideration before the Supreme Court, the question of the character of the execution did not properly arise, no question was made by the record, or was necessary to the determination in the case. The character of the execution was not discussed, no authorities on the point were referred to by Counsel, or the Court; with very great respect for Chief Justice Taney, I incline to think his decision of that point may be regarded as rather rather an *obiter dictum*.

But the defendant in this case relies on an estoppel *in pais*, as also protecting him in the purchase of the negroes in controversy. I shall not stop to consider the doctrine, but content myself with a reference to the cases of Cotten *vs.* Williams, Flor. Rep., 54, and Camp *vs.* Parkhill's administrators, decided at this term, for the doctrines of estoppel *in pais*, which I need hardly add have the sanction of my approval.

I will look at the facts of this case. Before the day of sale, one of the slaves purchased by Ponder applied to Moseley, one of the plaintiff's to purchase her. He declined (because he said he was unable,) but recommended her to apply to Ponder who owned her husband. She went to Ponder accordingly, and thereafter he attend-

ed the sale; at the sale Moseley was present—advised Ponder to purchase, and upon suggestion about title, said there would be no difficulty—said that he had hired the negro, and that she would suit Ponder. Moseley took an active part in separating and parcel ing the negroes so as to make them bring the best price. Mr. Archer, attorney for Mrs. Manly, forbade the sale, because he said the negroes were subject to her dower. Moseley expressed disapprobation; said the sale had better go on, that the negroes could not be sold at a better time. Said audibly to the crowd, bid up, bid up gentlemen, the property is not bringing half its price. The title will be good. And thereupon the property sold better. Moseley bid at the sale as high as $800 for one negro woman, and at least bid for two slaves at that sale.

Manly also was there and kept an account of the sales; asked William Bloxham, a witness, to bid against Col. Gamble who was buying slaves for Meintzhagen without competition. Witness did so and caused the slaves bought by Gamble to bring at least $1500 more than they would have done. During all this time we hear nothing of a void judgment—a void execution—or a bad title to property—or an improper levy on property. The only claim interposed is for Mrs. Manly's right of dower. The parties even seem to waive that, and *a fortiori* any other claim—and it is most certain, it is not now the pretext for this attempted recovery.

The administrators *de bonis non* were present assisting at and encouraging and aiding this sale. The property sold according to testimony at its fair value. Can now any reasonable person arrive at any other conclusion, than that the condition of the purchaser or purchasers was or were changed by this conduct. Suppose these administrators by themselves or their attorney with their assent, had said : This property has been wrongly levied; it is the property of the administrators *de bonis non* of Parkhill deceased; it has been levied on as the property of the administrators whose letters have been revoked. The judgment is void. The execution is void. The whole matter is illegal, and purchasers will buy at their peril. Would the property under such circumstances have brought fair value. Would Ponder who is represented as a prudent, cautious man, have become a purchaser. Was not in fine, a belief induced by the conduct of these administrators which caused the purchaser Ponder to change his previous position. If so, (and so we think) then by the law of estoppel they are concluded from

35

averring against Ponder a different state of things existing at the same time.

The foregoing remarks and authorities referred to, rightly considered, we think, shew that the Superior Courts of the Territory of Florida, were Courts of general jurisdiction. That the Superior Court of Leon County had and rightly took jurisdiction of the subject-matter in the case of the Union Bank of Florida *vs.* Parkhill's administrators. That the defendants in that action were legally summoned to answer to that suit, and appeared and pleaded pleas in bar. That that Court having competent jurisdiction, both of the subject-matter, and the parties, gave judgment in favor of the plaintiff.—That while that judgment was in full force, and when no appeal or writ of error had been sued out on it, an execution issued on said judgment (as well as on sundry other like judgments) from the Clerk's office of said Superior Court, pursuing the judgments 'on which they had been respectively issued, and according to law—which executions were all placed in the hands of the Marshal who was the officer of said Superior Court. That by virtue of said execution the Marshal levied upon the negroes in controversy, and upon others being the property and effects of the estate of S. Parkhill, deceased, according to the very right of the case. That under and by virtue of those executions and levy, after having duly advertised, he sold at public outcry, to the highest bidder, the said slaves for ready money. That William G. Ponder, the (defendant below in this suit, and) appellant in this Court, became the purchaser, paid for and took possession of the negroes now in controversy. That said judgments being judgments of a Court of Record of general and competent jurisdiction were not and could not be *void;* but valid, unless appealed from, or reversed for error, and therefore voidable only.

That a purchaser at a public sale, under and by virtue of an execution issued upon a voidable judgment, if sale be made before the judgment is reversed, acquires a good title. That nine of the judgments upon which executions issued are valid even if erroneous, the limitation of time for appeal or writ of error having expired. And that there was no irregularity in the levy material to the very right of the parties the true defendant being Samuel Parkhill in his life time and his representatives in right of his estate after his death, and the property levied on and sold, his property to pay his debts, and that the plaintiffs are estopped to deny his title.

William G. Ponder, *vs.* W. D. Moseley and others, Administrators.

The Court will forbear to express their sense of the inconvenience which would result in society from the establishment of a rule, which would create uncertainty among buyers, at Sheriff's sales under executions issued from their highest Courts of record and original jurisdiction. It might perhaps be justly apprehended that such a rule would disarm the Courts of the power to redress private wrongs or to enforce private rights.

We are therefore of opinion, that the Circuit Court erred in the instruction under consideration. That the judgments and executions under which the slaves were sold were not *void*. That they gave a sufficient authority for the sale, and that the right of property in these slaves passed by the sale to the defendant or appellant, William G. Ponder.

The foregoing opinion being conclusive of this whole case, the Court have not deemed it necessary to look further into the assignment of errors set down in the record.

*Per Curiam.*—The judgment of the Court below is reversed and the Clerk of this Court will tax costs in favor of the appellant.

---

HAWKINS, J., said, that he agreed to the conclusions, but not altogether to the reasoning of the Court as expressed in the opinion of Judge Lancaster. He was in favor of a reversal exclusively on the ground that the plaintiffs in the Court below were estopped by their words and conduct to deny the title of Ponder to the slaves in question.